63 Cal.2d 648 (1965)
THE PEOPLE, Plaintiff and Respondent,
v.
ARCHIE DAVIS, Defendant and Appellant.
Crim. No. 8061. 
Supreme Court of California. In Bank. 
Dec. 7, 1965.
 John A. Gunning and Evans & Gunning for Defendant and Appellant.
 Stanley Mosk and Thomas C. Lynch, Attorneys General, Edward P. O'Brien and Robert R. Granucci, Deputy Attorneys General, for Plaintiff and Respondent.
 PEEK, J.
 Defendant, following his conviction of murder in the second degree, appeals from the judgment on the grounds that the evidence is insufficient, that the homicide was justified and that the exclusion of testimony of specific acts of violence on the part of the deceased was prejudicial error.
 [1a] The deceased, Norman Reed Morris, was the common-law husband of Mattie Gillen, defendant's mother-in-law. On December 8, 1962, a Saturday, following a beating by Morris she left the home in which they had been residing and asked her daughter and defendant to allow her to stay with them. She was emotionally upset, and stated to defendant that Morris had threatened to kill her. She also told *651 defendant of numerous earlier instances when deceased had threatened and abused her. Defendant had knowledge of prior beatings and acts of violence administered by deceased to Mattie and others. He took Mattie to the police station where they reported this latest attack. After taking her home he sat up with her most of the night because of her distraught condition. Mattie continued to reside with defendant and his wife until after the killing.
 On Tuesday morning, December 11, defendant drove Mattie in her automobile to the laundry where she was employed. At approximately 4 p.m., still using Mattie's car, defendant drove to her place of employment for the purpose of meeting and driving her to their home after she finished work for the day. When he arrived he saw deceased who had preceded him in his car, and was also waiting for Mattie. While the two men waited deceased entered defendant's car and they chatted amicably. Defendant noted that deceased had been drinking.
 When Mattie came out of the laundry deceased attempted to engage her in conversation. She declined to talk with him and went back into the building. Deceased followed and insisted that they discuss their relationship, but she steadfastly refused to do so. Finally, as Mattie testified, she requested one of her fellow employees to call the police and deceased departed.
 There is a conflict in the evidence as to certain critical portions of what thereafter transpired. Defendant testified that upon leaving the building deceased approached the car in which defendant sat, threatening all the while to kill him and Mattie, abusing both in foul language, and berating defendant for having called for Mattie. Defendant claimed that deceased had in his hand an open, switch-blade knife which defendant had previously seen in deceased's possession, and with which he had known deceased to attack other persons. He also testified that he knew deceased was a violent man, and feared that he could and would carry out his threats.
 The deceased was 6 feet 4 inches in height and weighed 240 pounds. Defendant is of average size and had lost one leg in an accident as a boy. He testified that he felt he could not protect himself against the larger man armed with a knife, and pleaded with deceased to stay away. These pleas were heard by witnesses inside the building. According to defendant, when the pleas were ignored, he reached into the back seat where he had a shotgun and, in full view of deceased, *652 loaded the same with the one shell he carried with him. His only purpose, he stated, was to frighten Morris. Defendant further testified that nevertheless deceased continued to approach and attempted to reach for the gun; that, fearing for his life, he aimed for the deceased's upper arm or shoulder and pulled the trigger. The deceased retreated a few steps, according to defendant, and fell within several feet of the car. Death was almost instantaneous. Defendant and Mattie drove away from the scene to defendant's place of business, called the police, and defendant surrendered to the officers who responded to the call.
 Numerous witnesses smelled whisky on deceased's breath, and a whisky bottle was found in his car.post mortem examination showed blood-alcohol level of .18 which, the People concede, "meant that while he might not have appeared drunk to a casual observer he could not have safely driven an automobile."
 Several witnesses testified without dispute as to the deceased's reputation as a violent man who was known to have attacked other persons without provocation and as to defendant's reputation as a quiet, peace-loving person.
 The foregoing account is inconsistent in some respects with the testimony of prosecution witnesses although all of them testified to hearing defendant tell decedent to stay away. One such witness testified that a minute or two after the deceased left the laundry building she heard defendant plead with someone to stay away, and upon looking through the open door of the laundry she saw defendant, half standing and half sitting in his car with the door open, reach for, aim and fire the shotgun through the car window. From her point of view she could see no one near defendant as he fired.
 A second employee testified that she saw, through a window of the laundry, defendant standing by the car, just outside the driver's seat; that he aimed and fired a shotgun at deceased who was standing some 10 to 12 feet away; that deceased fell immediately; that she could not say whether deceased was moving toward defendant at the time the latter fired.
 A third employee testified that just before the gunshot she looked out a window and saw deceased standing in front of the bumper of the car; that she exclaimed, "It looks like he is trying to run over him!"; that the car had moved forward from the position in which she had first observed it as the two men sat and talked therein; that when the gun appeared *653 she took cover and heard but did not see the gun discharge. Her testimony that the car had been moved was corroborated by the owner of the laundry.
 No witness observed a knife in deceased's hands and none was found in the area of the homicide other than two closed knives in deceased's trouser pockets. There were no powder burns on deceased's body or clothing.
 [2] Among other things, defendant first contends, that the undisputed evidence shows as a matter of law the killing to be justifiable homicide; that he reasonably acted in defense of his person under the prevailing circumstances.
 A homicide is justifiable "2. When committed in defense of habitation, property, or person, against one who manifestly intends or endeavors, by violence or surprise, to commit a felony ... or, 3. When committed in the lawful defense of such person ... when there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury, and imminent danger of such design being accomplished. ..." (Pen. Code, 197.) "A bare fear of the commission of any of the offenses mentioned in subdivisions two and three of the preceding section, to prevent which homicide may be lawfully committed, is not sufficient to justify it. But the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone." (Pen. Code, 198.)
 Only if the jurors were required to accept defendant's version of the killing would we be inclined to agree with defendant's contention of justification. As indicated, however, there is substantial conflict in the evidence in respect to whether deceased was threatening defendant with an open knife as he approached, whether in fact he was approaching or was in defendant's immediate presence when the shot was fired, whether he lunged for the gun in defendant's hands, and what, if any, aggressive action defendant might have taken.
 [3] In addition to the foregoing the jurors were entitled to consider the relationships of the parties and the events which transpired before the fatal meeting at Mattie's place of employment. While there is no evidence of open conflict between deceased and defendant prior to the time of the killing, defendant nevertheless testified that he was afraid of deceased, usually consented to his demands because of that fear, and avoided him whenever possible. Defendant's personal *654 involvement with the acts of violence inflicted upon Mattie has been previously recounted. The significance of these matters and what bearing, if any, they might have had on the fact that defendant carried the fatal shotgun in Mattie's car when he drove to her place of employment, was for the trier of fact. In this regard it appears that defendant had used the gun for a number of years to protect his home and his restaurant business. He testified that it was his usual practice to load the gun and keep it near his cash register during the evening hours. After closing time he would take the loaded gun to his car, drive home, and keep the gun with him in his home during the night. In the morning he would unload the gun and put it in his car when he returned to the restaurant.
 On Monday, December 10, it appears that defendant drove Mattie to and from her place of employment, using his automobile. Nothing of significance occurred that day. Whether the gun was in the car on these trips does not appear. On Tuesday defendant's wife used his car, and he used Mattie's. He testified that he put the gun in the car in the morning before driving Mattie to work and that when he got to the cafe he forgot, as he did on occasion, to remove it to the cafe during the day. For that reason, he asserts, it was still in Mattie's car when he called for her in the afternoon. Some question was also raised because the gun was in a fully assembled condition while in Mattie's car, instead of being broken down into three pieces as defendant once stated was his usual practice. Mattie's testimony relative to the gun was also attacked. She testified that it was always in defendant's car when driven between the cafe and home, but it appears that she had stated to police officers that she had not seen the gun in the car on Tuesday morning when driven to work. The jury, of course, was not required to accept defendant's version of the homicide. (People v. Zilbauer, 44 Cal.2d 43, 48-49 [279 P.2d 534]; People v. Eggers, 30 Cal.2d 676, 686 [185 P.2d 1].) [4] The primary issue presented to it was to determine whether defendant reasonably believed, under all the facts and reasonable inferences, that he was threatened with such imminent danger as to justify the killing in self-defense. On the foregoing record this was a question of fact which is foreclosed on appeal. (People v. Mendes, 35 Cal.2d 537 [219 P.2d 1]; People v. Bender, 27 Cal.2d 164 [163 P.2d 8]; People v. Holt, 25 Cal.2d 59 [153 P.2d 21]; People v. McAuliffe, 154 Cal.App.2d 332 [316 P.2d 381].) *655
 [1b] The evidence although conflicting was also sufficient to support implied findings as to all elements of the crime of murder, it being "the unlawful killing of a human being, with malice aforethought." (Pen. Code, 187.) [5] While there was no direct evidence on the issue of malice aforethought, such element of the crime often is and properly may be implied from the circumstances of the homicide. "It is implied, when no considerable provocation appears. ..." (Pen. Code, 188.) It is contended, however, that malice cannot be implied from defendant's account of the killing and that the prosecution is bound by his testimony, reliance being placed upon People v. Mercer, 210 Cal.App.2d 153 [26 Cal.Rptr. 502]. In that case a conviction of second degree murder was reversed on the ground that the prosecution testimony consisted almost entirely of defendant's statements to the police, which statements tended to show justifiable homicide or manslaughter. The court held at page 158: "The prosecution having presented as a part of its case the statement of the defendant which justified the homicide is bound by that evidence in the absence of proof to the contrary." In the instant case the prosecution did not introduce or rely upon any of the statements of defendant although it depends in large part upon the testimony of the three witnesses each of whom testified that she heard defendant either plead with or threaten deceased not to continue to approach him immediately prior to the shooting. Defendant contends that in the absence of contrary proof the People are bound under the principle of Mercer by the statements of their own witnesses.
 [6] We agree with defendant's contention that the People are bound by their witnesses' statements, but it does not follow that they are also bound by defendant's testimony in all respects. Merely because the People's witnesses support defendant's claim that he warned the deceased not to approach, the People are not thereby bound by defendant's further unsupported and, in some material respects, contradicted account. There is nothing in Mercer or in the cases to which it refers which forecloses the question of the manner in which deceased approached defendant, deceased's possession of an open knife, aggressive actions, if any, taken by defendant, and defendant's motivations for the killing, and those questions must remain within the province of the trier of fact.
 Defendant further contends that the judgment must be reversed for prejudicial error in the sustaining of various *656 objections to defense attempts to elicit testimony from independent witnesses of prior incidents wherein deceased allegedly attacked other persons, sometimes with a knife such as defendant described. [7] While the character of the deceased is relevant on the issue of self-defense, generally it cannot be proved by specific acts of violence toward third parties. (People v. Garcia, 2 Cal.2d 673 [42 P.2d 1013]; People v. Wong, 83 Cal.App.2d 60, 69 [187 P.2d 828].) [8] However, in the present case defendant was not attempting to prove deceased's character. He was attempting to prove his own frame of mind. He was entitled to corroborate his testimony that he was in fear for his life by proving the reasonableness of such fear. The immediate issue was not the truth of the matters reported to him but whether he had cause to believe them and, if so, whether it was reasonable for him to predicate a fear thereon.
 In accordance with the foregoing defendant was permitted, under proper instructions, to testify as to specific acts of violence on the part of deceased which defendant had witnessed or which had been reported to him. He then sought, as to three instances of violence which he testified had been reported to him, to corroborate his testimony by the testimony of the victims, all of whom allegedly had been brutally attacked by the deceased. Such corroborating testimony was excluded, and it is such exclusion which is claimed to constitute prejudicial error.
 In People v. Carmichael, 198 Cal. 534 [246 P. 62], the defendant had sought to establish that he acted in self-defense in committing a homicide, and he was permitted to testify to a specific act of violence on the part of the deceased which had been reported to him by the deceased. However, corroborating testimony by an independent witness was excluded. In reversing a conviction for manslaughter for this and other errors, this court stated at page 548: "We cannot agree with respondent that this error was cured by the admission of the testimony of the appellant himself to the effect that this same statement was made by the deceased in the presence of himself and others on the afternoon of the day of the tragedy. The appellant was entitled to prove by disinterested witnesses, if he could, that the deceased made the statement attributed to him. It might be that the jury would hesitate to accept the uncorroborated evidence of the defendant in a case, when, if his testimony were supported by the evidence of a disinterested witness, they might take an entirely *657 different attitude toward it." (See also People v. Alpine, 81 Cal.App. 456 [254 P. 281]; People v. Singh, 78 Cal.App. 488 [248 P. 986]; People v. Jefferson, 34 Cal.App.2d 278 [93 P.2d 230]; People v. Jones, 136 Cal.App.2d 175 [288 P.2d 544]; People v. Yokum, 145 Cal.App.2d 245 [302 P.2d 406].)
 [9] In the instant case the jurors could well refuse to believe defendant's testimony and claim that his knowledge of acts of violence on the part of deceased, together with other matters, were sufficient to create a reasonable fear that his life was in danger, as in fact they did. Defendant was entitled to bolster his claims by corroborating testimony in his attempt to influence the jurors to a more favorable finding. The exclusion of the proffered testimony was error (People v. Mercer, supra, 210 Cal.App.2d 153, 161), and it remains to determine the prejudicial effect, if any.
 The record discloses that in spite of the exclusion there was very substantial testimony of knifings and other related acts of violence on the part of the deceased which was placed before the jury. In this connection defendant testified that on Saturday evening preceding the killing he saw deceased, who exhibited a knife of the type described by defendant as being in deceased's hands immediately before the fatal shot; that deceased asked for Mattie and stated: "If I find that SB, I'm going to put this knife around her ___ neck;" that defendant saw deceased later that evening and he again stated he intended to kill Mattie; that Mattie related to defendant numerous other incidents of violence committed upon her, usually involving the wielding of a knife by deceased; that she told defendant that deceased once assaulted a Mr. Tucker and would have killed him had Mattie not been successful in gaining possession of a gun deceased intended to use; that Mattie further told him of a killing by stabbing which deceased reported to her.
 Defendant then testified that deceased had told him of killing a man in Los Angeles, killing another in Louisiana, and having committed numerous robberies. Defendant stated that he had seen deceased knock a man down in the street, kick him numerous times and threaten him with two knives as the victim ran down the street. Defendant also witnessed a second, similar incident where deceased beat up and kicked a man, and forced him to run under threat of being cut with a knife. In addition, Mr. Lorenzo Banes related to defendant that he had been stabbed by deceased. Defendant also heard *658 that deceased beat and kicked a woman known as Margie, causing a miscarriage; that deceased attempted to kill Melvin Jackson by knocking him to the ground and then cutting him along the jaw, breaking his knife in doing so; that deceased had ridden up and down a city street discharging a rifle.
 Mattie testified that deceased possessed a knife similar to that described by defendant; that deceased had it with him constantly and used it to make her do "things he wanted me to"; that she saw the knife the Saturday evening on which he assaulted her; that she had told defendant of the many assaults committed upon her by deceased.
 Those witnesses whose testimony as victims was excluded are Mr. Jackson, Mr. Banes and Mattie. Defendant also offered the testimony of Mr. Herman Scott in further corroboration of the fact of the attack on Mr. Banes. As noted, the accounts of the attacks as related to defendant were placed in evidence, and each of the victims, as well as Mr. Scott and Mr. Willie Taylor were permitted to testify that deceased's reputation for peace and quiet was bad and that he was known as a dangerous man in the community.
 After a review of the entire record we are persuaded that the uncontradicted testimony going to the deceased's character as a violent, dangerous man, and defendant's knowledge and reasonable belief to that effect, is so conclusive that the erroneous exclusion of further similar evidence could not have affected the jury's determinations. On the record before them the jurors could not have entertained any doubt that the deceased's character was as depicted, and to add cumulative testimony on that issue would have been to no avail.
 [10] Error is also claimed in restricting testimony relative to deceased's possession of a knife similar to that described by defendant. However, after first limiting such testimony, the trial court reversed itself and announced: "The Court states to counsel for the defense that it will allow interrogation regarding the maroon-handled switch blade knife. Any rulings of the Court previously made to the contrary notwithstanding. You may proceed, then, to further interrogate on this subject, if you wish." Defense counsel then proceeded to interrogate Mattie concerning the knife, and it is manifest that any error which may have been committed earlier was cured by the court without prejudice to defendant.
 As to the noted errors in the exclusion of proffered testimony it does not appear that upon "an examination of the *659 entire cause, including the evidence" (Cal. Const., art. VI, 4 1/2), a result more favorable to defendant would have been reached in the absence of those errors. (People v. Watson, 46 Cal.2d 818, 836 [299 P.2d 243].)
 The judgment is affirmed. The appeal from a nonappealable order denying a new trial is dismissed.
 Traynor, C. J., McComb, J., Peters, J., Tobriner, J., and Schauer, J., [fn. *] concurred.
NOTES
[fn. *] *. Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.