[No. F027273. Fifth Dist. Jan. 29, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL ROMERO, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts II and III.

COUNSEL

Katherine Hart, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Harry Joseph Colombo and Timothy L. Rieger, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**WISEMAN, J.**—In an ever-increasing trend, this murder case arises from an all-too-familiar formula: one party commits a relatively minor "infraction" which quickly escalates into street violence and then death or serious injury. Many of us can relate to this phenomenon by reflecting upon our own experience behind the wheel of a car when a driver cuts too close to your vehicle, and "road rage" sets in.

The roots of this case are planted in a simple street scene. A group of men were crossing the road when Alex Bernal sped around the corner in his vehicle, and had to quickly brake. Words were exchanged, threats were hurled, and moments later Bernal was dying with a knife wound to his heart.

What makes this case unusual is defense counsel's attempt to introduce expert testimony on the sociology of poverty, and the role of honor, paternalism, and street fighters in the Hispanic culture. Although interesting, we conclude the trial court correctly decided this evidence was irrelevant to 1) whether defendant *actually* believed he was in imminent danger of death or great bodily injury; and 2) whether such a belief was *objectively* reasonable. In the words of the trial court, we are not prepared to sanction a "reasonable street fighter standard." The judgment is affirmed.

## PROCEDURAL HISTORY

By information, defendant was charged with the murder of Alex Bernal. (Pen. Code,[1] § 187.) It was further alleged defendant personally used a knife in the commission of the murder. (§ 12022, subd. (b).)

Defendant pled not guilty and denied the knife use allegation. A jury found him guilty of second degree murder, and determined the knife use allegation to be true.

Defendant's motion for a new trial was denied. Probation was also denied, and defendant was sentenced to prison for a term of 15 years to life on the murder, plus an enhancement of 1 year for the knife use, for a total of 16 years to life.

Timely notice of appeal was filed.

## FACTUAL HISTORY

In the late hours of August 3, and the early hours of August 4, 1995, defendant, Allen Powell, defendant's brother, Freddy Romero, Michael Madera, Jackie Fisher and Caytano Robles III (Junior), were all together at Junior's father's house in Modesto drinking alcohol. At some point they decided to walk to Diana Cantu's apartment to continue the party.

As they crossed the street near the corner of Riverside and Miller Streets, a car came speeding around the corner. The vehicle braked quickly to allow the group to cross the street. Some of the members of the group, including defendant, angrily yelled at the driver, Alex Bernal, to slow down. Bernal stated they should move out of the way, and that he was looking for somebody. He then sped up, and defendant again yelled at him to slow down.

At this point, Bernal pulled the car over and parked by the sidewalk. Defendant walked across the street toward the car shouting obscenities. Junior also approached the car on the passenger side. Bernal then pushed the driver's door open with his foot and kicked toward defendant, who was approaching him. Defendant backed off a little. As they swore at each other, Bernal said he was just looking for his daughter, Carolina, but also kept stating, "You want to fight? Come on, let's fight then." Defendant responded that he did not care that Bernal was looking for someone; he still should not have come around the corner so fast. Defendant also stated, " 'I'll fight, I'll

---

[1]All statutory references are to the Penal Code unless otherwise indicated.

fight . . . .' " When Powell heard Bernal say he was looking for Carolina, he told the group that Bernal was Carolina's father, and to "settle down."

Bernal then kicked off his shoes and began kicking into the air. Freddy Romero testified that both defendant and Junior fought with Bernal. After Bernal attempted to kick defendant and Junior, defendant struck Bernal in the chest with his bare hand. Then, Junior hit Bernal with his fist. Bernal fell, and defendant started walking away. Bernal also began to walk away, however, he yelled, " 'I'll be back.' " At this point, defendant took out a knife, unfolded it, held it by the grip, and swung it twice at Bernal missing both times. After another swing, Bernal stated, " 'I'm bleeding, you cut me.' " Everyone then left.

Allen Powell testified that both defendant and Junior approached Bernal as he attempted to get out of his car. When he opened the door, Powell saw that Junior had a knife and made a stabbing motion toward Bernal. It appeared that Junior made contact with Bernal, but Powell could not tell whether Junior had stabbed him. Bernal then began kicking, trying to get out of the car, however, he did not appear to be hurt. Although Junior remained in the area with defendant, Junior did not do anything else. Bernal kicked three or four times in the air, but never hit anyone. Bernal then took up a boxer's stance, ready to fight. He swung at defendant, but defendant dodged the blow and punched Bernal in the chest. Defendant immediately stepped back. Powell did not see a knife in defendant's hands. However, Bernal backed up and began to hold his chest. Bernal stated, " 'My heart, my heart. Stabbed me in my heart.' " As Bernal held his chest, Powell saw blood dripping down his fingers and onto his feet. Everyone began to walk away. Powell asked Bernal if he was all right. Bernal simply stated " 'I'll be back. I'll be back.' " Bernal then walked toward some apartments.

Michael Madera testified that it was not much of a fight. Bernal and defendant were fighting, and as Madera approached they were holding each other. As Madera got closer, he recognized Bernal as Carolina's father. He stated, " 'Hey, man, this is Carolina's dad.' " Madera grabbed defendant and pulled him off Bernal. As they separated, Bernal kept saying, " 'I'm going to come back for you. I'm going to come back for you.' " He also said, " 'You little punk, I'm going to get you.' " Defendant became angry and hit Bernal once in the chest. Bernal grabbed his heart and said, " 'I've been stabbed. Go get my daughter.' " Madera did not see a weapon in defendant's hand. He never saw Junior, who stayed on the sidewalk, go near Bernal. As everyone left, the last words he heard from Bernal were " 'I'll be back.' "

The group walked toward their friend's apartment and stood outside. Within 15 minutes, a police vehicle and an ambulance arrived.

Officer Moniz was dispatched to Miller and Riverside at 2:34 a.m. on August 4, 1995, regarding a stabbing. On his way, Moniz saw a shirtless man on the corner of Yosemite and Miller, who appeared to be out of breath. Moniz stopped and made contact with him. He noticed blood spatters on a T-shirt the man was holding, and on his tennis shoes. The man identified himself as Tommy Romero and then as Tommy Munoz. Moniz noticed abrasions on his upper arms, dried blood on his left palm, and lacerations on his right hand. The man was later determined to be defendant, and was taken to the Modesto police station.

Detectives Owen and Hendee later found two knives in a field approximately two hundred yards from the corner of Miller and Riverside. Officer Siville spoke with Bernal for over 30 minutes at the Stanislaus County Medical Center. Bernal was able to respond affirmatively when asked if he knew who stabbed him. However, he was in great pain and could give no further responses before he died.

Doctor Thomas Beaver, a pathologist and coroner, testified that he performed the autopsy on Bernal. Bernal was stabbed once in the right and once in the left side of the chest. He died from a stab wound to the heart. There were no defensive wounds on the victim's hands, arms or feet. Dr. Beaver opined that the knife which caused the wounds probably had a single-edged blade. A knife identified as People's exhibit 1 was capable of causing the fatal wound to Bernal. Bernal had a blood-alcohol level of .12 percent at the time of his death.

Criminalist John Yoshida conducted protein and enzyme analyses on the blood samples collected from Bernal, defendant, the knives found in the field, and from the crime scene. He found that defendant's phosphoglucomutase (PGM) type is 2 plus, 1 minus, and Bernal's was a 1 plus. Both defendant and Bernal tested as ACP type B. Defendant had an esterase D type 1, while Bernal had a 2, 1, type.

A comparison of the bloodstains with the known blood types of Bernal and defendant disclosed the following information: the blood on the asphalt was consistent with Bernal's and not defendant's blood; a stain on one of the knives was consistent with Bernal's types; a stain on the other knife was consistent with defendant's blood types; and the bloodstains on defendant's T-shirt and right shoe were consistent with Bernal's types.

*Defense*

Defendant testified that when Bernal came around the corner in the car, he yelled, "Slow down, fool." After Bernal parked and got out of his car, he

and defendant began fighting. Defendant separated from the group and approached the driver because he felt he had to protect his younger brother. The fighting stopped, and defendant started to walk away. Bernal then struck him from behind. At this point defendant retrieved a knife from an unknown person, and began swinging it at Bernal to scare him away. As defendant swung the knife, Bernal was backing up. Defendant testified, "I had to stop him. From there, I didn't think of nothing else, you know." Bernal kicked at defendant a couple times, and defendant swung the knife at him. His only intention was to stop Bernal, who was kicking toward him. Defendant, however, admitted, "I can't say that I was scared." Defendant felt he had to stop Bernal from getting past him. However, he said, "I can't explain me doing what I did to him . . . ." Defendant acknowledged stabbing Bernal in the heart, but claimed he was attempting to stab Bernal in the leg. While admitting responsibility for Bernal's death, defendant maintained he never intended anyone to die.

Defendant testified he never saw Bernal with any weapons. He admitted Bernal never did or said anything to give defendant a reason to think Bernal was out to get his brother. When asked what caused him to think he had to stab Bernal to protect his brother, defendant responded: "I don't know where my brother was standing, who was doing what, where. All I know I couldn't let [Bernal] get there." "I can't let him pass me." "All I know is to stop that guy."

Other defense witnesses testified to Bernal's drinking problem, his temper, and his violent past. One witness, James Howard, testified that in 1979, his passenger/friend had thrown a shot glass at Bernal's car. In retaliation, Bernal shot Howard's car with a shotgun.

## DISCUSSION

I. *The court properly excluded the testimony of a proposed expert witness regarding self-defense in the Hispanic culture.*

▮▮▮ Defendant contends the trial court erred by ruling that the proposed testimony of Martin Sanchez Jankowski, a sociology professor, was irrelevant and inadmissible.[2] According to defense counsel, Professor Jankowski had authored a book and numerous articles on the subject of street violence, and was an expert in Hispanic culture. We reject the claim of error and, in any event, find defendant was not prejudiced by the court's ruling.

---

[2]We summarily reject the People's contention that defendant waived this contention by failing to obtain a final decision on the matter. The record establishes the court ruled unequivocally that the proposed testimony was "clearly irrelevant," and "I'm not going to permit him to testify."

Defendant cites *People* v. *Humphrey* (1996) 13 Cal.4th 1073 [56 Cal.Rptr.2d 142, 921 P.2d 1] in support of his position that the proposed testimony was relevant. At pages 1082-1083, *Humphrey* summarized the law on self-defense as it relates to the use of deadly force:

"For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. [Citation.] If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter. [Citation.] To constitute 'perfect self-defense,' i.e., to exonerate the person completely, the belief must also be objectively reasonable. [Citations.] As the Legislature has stated, '[T]he circumstances must be sufficient to excite the fears of a reasonable person . . . .' (Pen. Code, § 198; see also § 197, subds. 2, 3.) Moreover, for either perfect or imperfect self-defense, the fear must be of imminent harm. 'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury.' [Citation.]

"Although the belief in the need to defend must be objectively reasonable, a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge . . . .' (CALJIC No. 5.50.) It judges reasonableness 'from the point of view of a reasonable person in the position of defendant . . . .' [Citation.] To do this, it must consider all the ' " 'facts and circumstances . . . in determining whether the defendant acted in a manner in which a *reasonable man* would act in protecting his own life or bodily safety.' " ' [Citation.] As we stated long ago, '. . . a defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind . . . .' [Citation.]" (13 Cal.4th at pp. 1082-1083, fn. omitted.) With these principles in mind, we consider the relevance of Professor Jankowski's proposed testimony.

According to defense counsel, Professor Jankowski's expertise deals with the sociology of poverty. He would testify that (1) street fighters have a special understanding of what is expected of them; (2) for a street fighter in the Hispanic culture, there is no retreat; (3) the Hispanic culture is based on honor, and honor defines a person; and (4) in this culture a person "would be responsible to take care of someone," i.e., defendant had a strong motivation to protect his younger brother. Stated differently, "He's the eldest male. He would assume a paternalistic role whether he wanted to or not. Something is expected of him."

Given the law, we conclude the testimony of Professor Jankowski was irrelevant to whether defendant actually believed he was in imminent danger of death or great bodily injury, and whether such a belief was *objectively* reasonable. We are unsure what defendant means by his reference to the sociology of poverty, and how it might affect his actual beliefs and the *objective* reasonableness of those beliefs. Similarly, even if we assume street fighters have a special understanding of what is expected of them, and that this is something with which the jurors are not acquainted, why is it relevant? Are street fighters expected to kill every person they fight with, regardless of the circumstances? If so, does this expectation replace or relax the legal requirement that before deadly force may be used a person must actually fear imminent death or great bodily injury? As noted by the trial court, "Then you're creating a separate standard for what you call street fighters." No authority or case law has been cited which supports a separate standard, and we decline to adopt one here. (*People* v. *Humphrey, supra,* 13 Cal.4th at p. 1087 ["Our decision would not, in another context, compel adoption of a ' "reasonable gang member" standard.' "].)

In the same vein, whether a person should or should not retreat from a "street fight," has no bearing on whether that person may lawfully use deadly force. A decision not to retreat from a physical confrontation and a decision to kill are two separate acts and involve different mental exercises. The laws governing self-defense recognize these distinctions and apply different rules to these legal concepts.[3] While defendant attempted to blur the distinctions between the laws governing self-defense, the trial court correctly did not.

The evidence regarding honor, like evidence of street fighter mentality, is not relevant to whether deadly force was warranted under the circumstances. Is there honor in killing an unarmed man, and assuming that in defendant's mind it was the honorable thing to do, how does this relate to self-defense? Clearly, the question of defendant's honor was irrelevant to whether defendant was in actual fear of death or great bodily injury, and whether his fear was objectively reasonable.

---

[3]In this case, the jury was instructed pursuant to CALJIC No. 5.50, as follows: "A person threatened with an attack that justifies the exercise of the right of self-defense need not retreat. In the exercise of his right of self-defense such person may stand his ground and defend himself by the use of all force and means which would appear to be necessary to a reasonable person in a similar situation and with similar knowledge; and such person may pursue such assailant until he has secured himself from danger if that course likewise appears reasonably necessary. This law applies even though the assailed person might more easily have gained safety by flight or by withdrawing from the scene."

However, the jury was further instructed pursuant to CALJIC No. 5.31, as follows: "An assault with the fists does not justify the person being assaulted in using a deadly weapon in self-defense unless that person believes and a reasonable person in the same or similar circumstances would believe that the assault is likely to inflict great bodily injury upon [him]."

Finally, even if defendant had a strong motivation to protect his younger brother, this does not answer the question of why it was necessary to use deadly force. Self-defense and defense of another are both recognized in the law.[4] However, as with the legal concept that one need not retreat, motive is only part of the question. Assuming defendant was justified in using force to defend himself and/or to protect his brother, the question of whether he could use deadly force was a separate issue. Any expert testimony regarding honor, tradition, street mentality, culture, paternalism, poverty or sociology simply was irrelevant.

*People* v. *Minifie* (1996) 13 Cal.4th 1055 [56 Cal.Rptr.2d 133, 920 P.2d 1337, 55 A.L.R.5th 835], does not help defendant's argument. There, the court held it was error for the trial court to have excluded evidence that the defendant (who shot a man that knocked him down and threatened to hit him with a crutch) had been threatened by members of a group who Minifie believed were associated with the victim. Unlike in *Minifie,* the testimony excluded in this case had nothing to do with a prior threat received by defendant from someone he associated with the victim. *Minifie* is not analogous to the issue here—the propriety of excluding sociological evidence.

Similarly, *People* v. *Davis* (1965) 63 Cal.2d 648 [47 Cal.Rptr. 801, 408 P.2d 129] does not help defendant. There, the evidence excluded was testimony from independent witnesses of prior incidents where the victim allegedly attacked other persons, sometimes with a knife. (*Id.* at p. 656.) In this case, defendant was permitted to, and did, present evidence of prior acts of violence by the victim. Thus, no error under the *Davis* rationale occurred.

*People* v. *Romero* (Cal.App., B051210), cited by defendant, was deleted from the official published reports following a grant of review by the California Supreme Court. The appellate court decision was therefore superseded. Since the Supreme Court did not subsequently reorder the Court of Appeal opinion to be published pursuant to California Rules of Court, rule 976(d), it is not citable as authority under California Rules of Court, rule 977(d).

Finally, defendant relies on *People* v. *Vu* (1991) 227 Cal.App.3d 810 [278 Cal.Rptr. 153] for his contention that the exclusion of Professor Jankowski's

---

[4]Here, the jury was instructed pursuant to CALJIC No. 5.13, as follows: "Homicide is justifiable and not unlawful when committed by any person in the defense of himself or another if he honestly and reasonably believed that the individual killed intended to commit a forcible and atrocious crime and that there was imminent danger of such crime being accomplished. A person may act upon appearances whether such danger is real or merely apparent."

testimony was error. There the court found the exclusion of an expert's testimony to be harmless error. The expert witness, a psychologist, was to testify about the effects of stress on perception to show that defendant's actual view of events may have differed from reality due to stress and preconceived expectations about what might happen. The defendant had testified he started to leave the apartment where his archenemy lived, after hearing someone call out to remove a gun and grenade. As he entered an alley, the victim, Cong Phan, and another man followed him. When he heard someone mention taking out a gun, and fearing he would be shot, he turned and shot Cong Phan. (*Id.* at pp. 813-815.) The court held the expert testimony was admissible "because defendant claimed he honestly believed Cong Phan was trying to hurt him." The expert testimony "would have supported defendant's argument that stress and expectations caused him to honestly perceive a threat where no threat was intended or apparent to others at the scene." (*Id.* at p. 814.) However, since the jury rejected the charge of attempted murder and convicted the defendant of voluntary manslaughter on the theory of imperfect self-defense, the defendant was not prejudiced by the exclusion of the expert's testimony. (*Id.* at pp. 814, 815.)

Putting aside the question of whether *Vu* was correctly decided, it is distinguishable. Here, unlike in *Vu*, defendant did not testify he was in imminent fear for his life at the time he stabbed Bernal. Thus, whatever stress he was under or expectation he had when he first started fighting with Bernal changed after it became obvious Bernal was not armed. Any preconceived notion defendant may have had about Bernal having a gun disappeared when Bernal fought by simply kicking into the air, and defendant could see he was unarmed. Under these circumstances, either defendant accidentally stabbed Bernal in the heart while attempting to stab his leg, as defendant testified, or he intentionally stabbed Bernal in the heart with malice aforethought, as established by the prosecution. Either way, defendant was not in fear of imminent death or great bodily injury when he stabbed Bernal. Although only defendant knows what his actual motivation was for stabbing Bernal, even his own testimony indicates it was not fear.

Further, no sociological expert could have provided this missing mental state of defendant's actual subjective state of mind at the time he stabbed Bernal. Therefore, even assuming Professor Janskowski could provide relevant testimony about street fighting, Hispanic honor and paternalism, its exclusion was harmless. Absent evidence that defendant was in fear of imminent death or great bodily injury, the jury had no evidentiary basis from which to conclude that defendant *subjectively* had an actual but unreasonable fear which negated malice aforethought. Thus, it is not reasonably probable that but for exclusion of the proffered evidence, defendant would have

received a more favorable result. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

II., III.*

. . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Dibiaso, Acting P. J., and Buckley, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 28, 1999.

---

*See footnote, *ante*, page 846.