Filed 6/1/26  P. v. Wells CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>JOHNNIE JABAAR WELLS,<br><br>        Defendant and Appellant. | B341609<br><br>(Los Angeles County<br>Super. Ct. No. BA516033) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Craig Richman, Judge.  Affirmed and remanded; sentence vacated.

Victor J. Morse, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, and Michael C. Keller and Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.

Johnnie Jabaar Wells appeals from his judgment of conviction for murder and related firearm offenses. He argues the court erred when it refused to permit Wells to testify as a gang expert, and that this testimony would have supported the self-defense theory he presented at trial. Regardless of whether Wells could have qualified as an expert witness, the proposed testimony is irrelevant. The court correctly excluded it.

We, however, agree with both Wells and respondent that the court erred by imposing the high term for certain enhancements. Because the court did so based on aggravating circumstances not found by the jury and to which Well did not stipulate, it violated Penal Code section 1170.1 and Wells's Sixth Amendment rights.[1] Accordingly, we vacate the sentence and remand for resentencing in a manner consistent with section 1170.1. In all other respects, we affirm the judgment.

## SELECTED FACTUAL AND PROCEDURAL BACKGROUND

### A. Trial

The People charged Wells with first degree murder (§§ 187, subd. (a), 189, subd. (a)), possession of a firearm by a felon (§ 29800, subd. (a)(1)), and assault with a firearm (§ 245, subd. (a)(2)), all based on allegations that Wells shot Jeremiah Turner and fatally shot Charles Brown. The People also alleged several enhancements.[2]

---

[1] Unless otherwise indicated, all further statutory references are to the Penal Code.

[2] As to the assault and murder counts, the People alleged Wells personally used a handgun (§ 12022.5, subd. (a)). As to the

### 1. *Prosecution's Case*

At trial, the prosecution presented evidence establishing the following:

On May 20, 2024, Wells met his friend Rickie Yarbrough and his ex-girlfriend, Lepreshia Tucker, at the Defiant Motorcycle Club (Defiant). Wells and Yarbrough were both members of the 11 Deuce Neighborhood Crips gang.

The Hoovers, a rival gang of the Neighborhood Crips, control some areas around Defiant. The Neighborhood Crips control other areas around Defiant. Gang members care about controlling their gang's territory and excluding members of other gangs. Motorcycle clubs, however, are open to people from different gangs as long as they "leave [their] gang membership at the door." It is possible for members of rival gangs to get along at these clubs.

Surveillance video from Defiant shows that, at 1:29 a.m., Wells, Yarbrough, and Tucker were talking while on the sidewalk in front of the club. Brown and Turner walked close to the group, but did not interact with any of them. Brown was a relatively junior member of the Eight-Tray Hoovers gang. Neither Wells nor Yarbrough had any interactions with Brown or Turner at Defiant. Later video footage shows Brown and Turner leaving Defiant together.

After Tucker observed "something happen[ing]" between Yarbrough and a Hoover gang member named "Hoover T," she

---

assault count, the People alleged Wells inflicted great bodily injury on Turner (§ 12022.7, subd. (a)). Additionally, as to all the counts, the People alleged Wells suffered two prior convictions for robbery within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).

sensed "tension."  Hoover T appears in surveillance footage, but police were unable to identify him.  Another Hoover gang member known as "Smacc" who was also at Defiant spoke with Yarbrough and Wells.

Later that night, Wells, Yarbrough, and Tucker went to LA Riders, a motorcycle club a few miles from Defiant.  Smacc was there as well, as were Brown and Turner.  Neither Wells nor Yarbrough had any interactions with Brown or Turner inside LA Riders.

A man named James Nelson recorded a video inside the club "to show the atmosphere," which he immediately posted on Instagram.  The video included images of Wells.  Nelson denied any gang affiliation.  Text messages sent and received from Wells's phone the night of the shooting discuss this video.  Wells's cell phone received a text message attaching the video and stating, "Cuz was on y'all the [w]hole time."  The user of Wells's phone responded:  "There's a lot going on with the Snoovas and Troubles passing my picture around they have been plotting on us since they seen us . . . they were recording and sending pictures around to they homies.  The homey from Brims."

Surveillance video depicts Smacc engaged in a shoving match with an unnamed man on the sidewalk in front of LA Riders.  While Wells was watching the fight, Brown and Turner walked in front of Wells but did not look at him.  Immediately before Brown and Turner walked by, Wells turned towards Yarbrough and shrugged his shoulders.

Soon thereafter, around 4:15 or 4:20 a.m., Wells shot at Turner and Brown.  Turner ran southbound; Brown fled in the opposite direction.  Wells ran after Brown, firing multiple shots at his back.  Brown fell to the ground, his body writhing.  Wells

4

stood over Brown briefly, raising one arm, then walked back towards the club. He walked past an unidentified man who was holding a gun in each hand and Wells shrugged his shoulders. Tucker drove Wells back to Defiant, where Wells's car was parked.

Forensic investigation revealed Brown suffered multiple gunshot wounds, two of which proved fatal. Turner sustained a gunshot wound to the chest but survived.

The day after the shooting, Wells called Tucker and told her, "Don't say nothing." He also stated, "I fucked up, I fucked up. Man I fucked up." He did not say anything about being concerned for his safety at the time of the shooting. Wells also did not say anything to this effect when he spoke with Yarbrough after the shooting, nor when interviewed by police.

### 2. *Yarbrough's Testimony*

Yarbrough denied any involvement in the shooting. Hoover T "spooked" Yarbrough at Defiant by being "aggressive" about the Yankees hat and jacket Yarbrough was wearing, which could be interpreted as affiliated with the Neighborhood Crips. Yarbrough became fearful and tried to get a gun to protect himself but was unsuccessful. After that, Yarbrough told Wells and Tucker that the "incident" between Yarbrough and Hoover T was "over."

Yarbrough was not concerned about Wells's safety during the fight in front of LA Riders. He believed that there was "no need for [Wells] to [be] . . . scared."

### 3. *Wells's Testimony*

Wells testified that he shot Turner and Brown because he "fear[ed] for his life," and that Yarbrough was not involved in

5

any way.  Wells regularly carried a gun for protection, including on the night in question. He had been shot in the past and "just [knew] how it [was] out there in [L.A.]"

While at Defiant, Yarbrough confessed to Wells that he had been talking about gang activity with Hoover T, in violation of club rules.  Smacc assured Wells everything had been resolved and no one should worry.  Wells did not believe this but remained at the club because everything seemed peaceful.  He did not "notice . . . [¶] . . . [¶] . . . or pay attention to" Brown or Turner at Defiant.

While inside LA Riders later that evening, Wells did not notice any tension or animosity towards him.  When Wells and Yarbrough arrived there, they talked briefly with Smacc and saw other people who had been at Defiant earlier.  Wells did not notice Brown or Turner.

Wells believed the fight between Smacc and another Hoover in front of LA Riders resulted from Smacc having been "confrontational with Hoover T" earlier.  While watching the fight, Wells saw Brown and Turner further up the sidewalk.  He heard someone say, "Knock the nigga S dome off his head. Go right there.  Get that nigga, groove."  Wells believed that the term "S dome" was a reference to the Seattle Mariners hat Wells was wearing.  These hats are popular with Rolling 60's Crips gang members, but they are not always associated with the Crips, and rival gangs also wear them.  Nevertheless, wearing such a hat could offend Hoovers gang members.

Wells believed that whoever made the "S dome" comment was referring to him, and that he was in "mortal danger." He therefore opened fire on Turner and Brown.  According to Wells, "when that comment came out of nowhere, like, what I do

6

basically like, what's going on?  You know, and I reacted the way I reacted because I didn't know what was going on.  [¶]  I just know when I heard that . . . they coming to get me.  So I reacted.  I pulled my gun out, and I reacted the way I reacted."

Wells explained he chased and continued firing at Brown as Brown fled because Wells believed that, if he stopped firing, Brown might draw a gun.  Wells "didn't know what was going on" so he "[j]ust ke[pt] on shooting until [he could not] shoot no more."  Afterwards, when he walked by the unidentified man holding two guns, Wells shrugged his shoulders to indicate, "I don't know" and kept on walking away to avoid a confrontation.

Wells had no conflict with either Turner or Brown.  The "S dome" statement came from behind him where Turner, Brown, and others were standing.  Although he did not know who made the statement and was not familiar with either man's voice, he had a "specific" fear of the person who made the "S dome" statement and believed that he had no choice but to kill Brown.  Wells was afraid "generally," not specifically afraid of Brown or Turner.  This "generalized fear" continued after he shot Turner and led him to chase and continue shooting at Brown.  Wells also explained that his reaction was due in part to "life stressors," his previous experience in prison, and that he had previously been shot.

Text messages from Wells's phone earlier that evening express concerns about being attacked by the Hoovers.  One message sent from Wells's phone stated, "[T]hey just put a green light on me and Bam."  Bam referred to Yarbrough.  Wells's phone received a message responding, "I was thinking that but I don't think they're but okay be still though stop moving it around stay out of Bam's car."  Wells's phone also received a message

stating, "The boy that don't bang his family from Hoova he not I actually know him Ben Ten." Ben Ten referred to Brown.

### 4. *Efforts To Offer Testimony About Hoover T's Gang Status*

Defense counsel attempted to elicit testimony from Wells that, based on Hoover T's actions in the surveillance footage, Hoover T was a "high-ranking member" of the Hoovers capable of ordering more junior members to kill someone. This opinion was relevant, defense counsel argued, because it supported the defense's theory that Hoover T had masterminded a conspiracy to kill Wells and/or Yarbrough after Yarbrough offended Hoover T. This theory required Hoover T to have both authority and motivation to direct other Hoovers to follow Wells and Yarbrough from club to club, video-record them, and post the video on social media as a means of encouraging other Hoovers to pursue revenge for Yarbrough's act of disrespect.[3]

Wells and his counsel confirmed that Wells did not believe Hoover T was a high-ranking member of the Hoovers "at the time" of the shooting and would instead be offering testimony based on Wells's analysis of the surveillance video. The People objected based on lack of foundation, relevance, and Evidence Code section 352. In response to these objections, defense counsel clarified its intent to qualify Wells as a gang expert for purposes of this testimony.

---

[3] The People's gang expert testified that a senior Hoovers gang member could order a killing of someone wearing an offensive Mariners hat. Stalking a person for wearing an offensive hat, video recording that person, and posting images on social media could function to encourage or green light killing that person.

The court did not qualify Wells as a gang expert. It also did not permit Wells to testify about the night of the shooting based on anything except his experiences and observations that night and the text messages to and from his phone that night. As a result, Wells was not permitted to testify, either as an expert or percipient witness, about Hoover T's gang status.

### 5. *Verdict and Sentencing*

The jury found Wells guilty as charged. The court sentenced Wells to 50 years to life on the murder count; 9 years on the assault count; the upper term of 10 years on each of the two firearm-use enhancements; and, to be served concurrently with the other terms, two years on the firearm possession count.

Wells timely appealed.

## DISCUSSION

Wells argues the court reversibly erred both at trial and at sentencing. We address each argument in turn.

### A. Testimony Regarding Hoover T's Gang Status

To establish he acted in self-defense, a defendant must show that (1) when committing the crime, he subjectively feared for his life, and (2) his fear was objectively reasonable. (See *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082–1083 (*Humphrey*).) In assessing objective reasonableness, "a jury must consider what 'would appear to be necessary to a reasonable person *in a similar situation and with similar knowledge.*' " (*Ibid.*, italics added; see *id.* at p. 1083 [jury "judges reasonableness 'from the point of view of a reasonable person in the position of defendant' "].)

9

Wells claims the court erred by not allowing him to present testimony relevant to the objective reasonableness requirement: namely, expert testimony that Hoover T was a high-ranking member and "shot-caller" in the Hoovers gang. Wells argues this testimony, and/or testimony about a hypothetical based on Hoover T's actions as depicted in the surveillance video footage, could have helped the jury understand Hoover T had the power to order more junior Hoovers like Brown and Turner to kill Wells and/or Yarbrough in response to Yarbrough's earlier show of disrespect. Wells thus sought to use this testimony to argue it was objectively reasonable for Wells to have interpreted the "S dome" comment as a death threat on the night in question.

As the court correctly instructed the jury, however, objective reasonableness depends on "the circumstances *as they were known to and appeared to the defendant*" at the time and "what a reasonable person *in a similar situation with similar knowledge* would have believed." (Italics added.) (See *Humphrey, supra*, 13 Cal.4th at p. 1083.) Wells admits he did not know Hoover T's gang status on the night in question, nor was he aware that night of the basis for the opinion he would later form on this topic. Rather, he conceded below and does not dispute on appeal that he formed his opinion about Hoover T's status entirely in hindsight based on reviewing surveillance videos depicting Hoover T's actions on the night of the shooting. Thus, whether it was objectively reasonable to perceive an immediate danger upon hearing the "S dome" comment, had Wells known of Hoover T's status on the night of the shooting, is irrelevant to his claim of self-defense. Accordingly, even assuming Wells could have qualified as a gang expert, the court correctly ruled the

10

proposed expert testimony is irrelevant to show Wells's fear was objectively reasonable at the time of the shooting. (See *ibid*.)

In arguing to the contrary, Wells cites cases that are distinguishable. First, he relies on *People v. Davis* (1965) 63 Cal.2d 648, in which the defendant "testif[ied] as to specific acts of violence on the part of [the] deceased *which defendant had witnessed or which had been reported to him*" before the homicide. (*Id*. at p. 656, italics added.) The defendant then sought "to corroborate his testimony [with] the testimony of the victims [of these prior acts of violence]." (*Ibid*.) *Davis* thus addressed the admissibility of evidence corroborating circumstances of which the defendant *was* aware at the time of the alleged self-defense. Wells's proposed testimony does not serve this purpose, because he does not claim to have seen or experienced anything that night suggesting Hoover T was a high-ranking gang member.

Wells also cites *People v. DelRio* (2020) 54 Cal.App.5th 47. In *DelRio*, the only living witness to a fatal shootout was the defendant, who contended the victim began antagonizing him without provocation and drew his gun first. (*Id*. at pp. 49–50.) To corroborate the defendant's description of the victim's behavior, defendant offered propensity evidence that the victim had instigated other physical altercations in the past. (*Id*. at p. 53.) This evidence was relevant to the defendant's self-defense argument even "[i]f [the victim's violent character] was not known [to the defendant]" at the time of the shooting, because the defendant was not offering the evidence to prove the defendant's state of mind at the time of the shooting. (*Id*. at p. 55.) Rather, the defendant was offering it to corroborate what defendant claimed he saw *the victim do*. (*See ibid*.) Here, by contrast, Wells's theory of self-defense does not depend on what *Brown and*

11

*Turner did* before Wells shot them—it depends exclusively on what Wells believed at that time. Testimony about facts of which he was not aware in that moment is thus irrelevant, as the court correctly determined.

### B.     Sentencing

Wells argues the court erred when it imposed the upper term sentences on his firearm enhancements, because it did so based on aggravating factors to which Wells did not stipulate and that the jury did not find. Respondent agrees, as do we, that this was error, and that a remand for resentencing is required.

"If an enhancement is punishable by one of three terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except . . . [¶] . . . when there are circumstances in aggravation that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial." (§ 1170.1, subd. (d)(1)–(2).) "[A] Sixth Amendment violation occurs when the trial court relies on unproven aggravating facts to impose an upper term sentence" and "is prejudicial unless an appellate court can conclude beyond a reasonable doubt that a jury would have found true all of the aggravating facts relied upon by the trial court." (See *People v. Lynch* (2024) 16 Cal.5th 730, 768 (*Lynch*).)

Here, the jury did not find any aggravating circumstances, nor did Wells stipulate to any. The court nevertheless concluded "a significant number of aggravating factors in this matter" supported imposing upper term sentences on the firearm enhancements. But because the court did not specify which ones,

we cannot determine whether a jury necessarily would have found these factors true.  Accordingly, this error is prejudicial. (See *Lynch, supra,* 16 Cal.5th at p. 768.)

## DISPOSITION

The sentence is vacated.  Following remand, the trial court shall resentence Wells consistent with the views expressed herein.

In all other respects, the judgment is affirmed.

<u>NOT TO BE PUBLISHED</u>.

ROTHSCHILD, P. J.

We concur:

BENDIX, J.

M. KIM, J.