Filed 1/8/15  P. v. Shui CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H039599 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1112822) |
| v. | |
| PETER SHUI, | |
| Defendant and Appellant. | |

A jury found defendant Peter Shui guilty of second degree murder and found true an allegation that he used a deadly weapon in the commission of the offense.  (Pen. Code, §§ 187, 12022, subd. (b)(1).)[1]  The trial court sentenced defendant to an aggregate term of 16 years to life in prison.

Defendant raises two claims on appeal.  At the time of the offense, defendant and the victim, Lijia Zheng, were arguing in Mandarin when Zheng described defendant's wife in profane terms.  Defendant contends the trial court erred by excluding expert testimony that the words Zheng used were "uniquely provocative" in Chinese culture. Defendant claims the trial court thereby violated his federal constitutional rights by denying him the opportunity to present a heat of passion defense.  Second, defendant

---

[1] Subsequent undesignated statutory references are to the Penal Code.

claims the trial court erred by giving the jury conflicting instructions on the intent required for involuntary manslaughter.

We conclude the trial court did not err in either respect. We will affirm the judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Facts of the Offense*

The evidence is undisputed that defendant killed his paramour, Lijia Zheng, by stabbing her multiple times with a kitchen knife in August 2011. Defendant was intoxicated on alcohol and Xanax at the time. His defense focused on his state of mind at the time of the offense.

#### 1. *Defendant's Testimony*

Defendant, 48 years old at the time of the offense, was married with two children. He immigrated to the United States from Taiwan with his wife in 1990. He initially worked at technology companies run by his brothers, but he quit working regularly in December 2006. At the time of the offense, defendant earned about $1,000 a month playing mahjong several times a week.

At trial, defendant testified as follows. He met Zheng while playing mahjong in 2007. They soon became friends and began having sex in 2008. Defendant's wife discovered the affair and became angry, but the couple remained married. Defendant ended his relationship with Zheng for a few months in 2009, but he later resumed the affair. Defendant's wife and daughter were aware of the ongoing affair, but defendant said he could not stop himself from seeing Zheng.

On the morning of August 3, 2011, defendant's wife saw Zheng at a supermarket carrying an expensive handbag, which the wife mistakenly believed defendant had purchased. The wife, angry at defendant for living "the high life" with Zheng, called him on the phone to scold him. Afterwards, defendant immediately called Zheng and told her

2

his wife was upset about the handbag.  Zheng advised defendant to let his wife vent and told him not to argue with her.

The next day, defendant played mahjong while Zheng went furniture shopping with friends.  Defendant began drinking red wine during the game.  When the game ended, Zheng was having dinner with her friends, so defendant went home to his wife.  He opened another bottle of red wine and continued drinking.  Later in the evening, Zheng invited defendant to come to her apartment for the night.  After Zheng pleaded with him several times to join her, defendant finally agreed, so Zheng drove to his house to pick him up.  Defendant brought another bottle of red wine with him.  He remembered being in the car with Zheng on Interstate 280 and seeing the exit for Wolfe Road, but he testified that things became vague after that.

Defendant could not recall arriving at Zheng's apartment, but he recalled drinking more wine when he was there.  His habit was to sit in the bathroom with Zheng and talk with her while she showered.  He could not specifically recall doing so that night, but he did recall Zheng washing her face and wearing his pajamas.  The next thing he could remember was Zheng saying: "Fuck your mother.  That silly cunt of yours.  [¶]  She thought you bought me the bag."[2]  This was a reference to defendant's wife.  Zheng had never said anything like that before, and she had never used that kind of language before.  Defendant could not recall what he said to Zheng in response.  When defense counsel asked defendant how Zheng's statement made him feel, defendant responded:  "I cannot describe.  Up until today, I still don't know how."  When counsel repeated the question, defendant added:  "How could she have possibly said such a thing because sometimes when we talked about arguments between my wife and I, she would actually to try [*sic*] talk me out of it."  Defendant could not recall if he told Zheng not to repeat the statement.  He could not recall if she said it more than once.

_____

[2] Defendant testified through a Mandarin interpreter.  The quoted text is the interpreter's English translation of defendant's testimony.

3

Defendant testified that the next thing he remembered was feeling like he had killed Zheng. He remembered going to the kitchen, but he did not recall getting a knife. He testified that he did not want to kill Zheng, and he did not know how it happened. At first, he testified that he could not remember stabbing her at all, but he then added that he had "a little bit of a memory" of stabbing her in the neck. His next memory was that his hands were in pain and that he was bleeding. He remembered going to the bathroom to wash his hands, and he remembered moving Zheng's cell phone. Then he went to the kitchen and tried to wrap plastic wrap around his head so he could no longer breathe. After finding he could still breathe, he applied another piece of plastic wrap to his head. When he could no longer breathe, he took off the plastic wrap and called 911.

Defense counsel again asked defendant if Zheng's statement about his wife had made him angry. Defendant testified that "I think it must have," but stated: "I don't remember how I felt." He added: "When she was saying those words, I look at her face and her face turned into one of a ghost, and it was approaching me like that." When defense counsel asked defendant if he killed Zheng because of her statement, he responded: "I don't know how to say whether yes or no. [. . .] We didn't even argue. How did I end up killing her? I never thought about killing her."

On cross-examination, defendant testified that Zheng had loaned him about $11,000 or $12,000. But he testified that he repaid the loan by having his brother wire money to Zheng's bank account. He denied owing Zheng money at the time of the offense in August 2011, but he admitted that he was financially distressed and bankrupt at the time. Defendant could not recall if he had taken Xanax on the night of the offense. When shown the knife he used to stab Zheng, defendant testified that he could not recall using the knife to stab her, but he admitted that he could recall washing it in the kitchen sink. When asked if he killed Zheng because of what she said about his wife, defendant responded: "I really don't know if that was why. I'm just stating what I remember and to answer the questions that you're asking."

4

2. *The 911 Call*

Defendant called 911 at 2:36 a.m. on August 5, 2011.  An audio recording of the call was played for the jury.  Defendant requested a Mandarin translator, who interpreted for him during the call.[3]  Defendant said: "I, I kill my girlfriend.  [. . .]  I, I, I just come to, uh, I just want to admit this, this happening."  Defendant said it had happened a half-hour ago.  When asked how he killed his girlfriend, he stated:  "I don't know what I used to kill her.  I, I drink too much."

After the operator again asked defendant how he killed her, he responded: "Because she's, uh, yelling at me, yelled at me, so I used a knife to kill her."  He said Zheng's body was in the bedroom.  He subsequently added:  "I injure her so many places because she keep yelling at me."  The operator asked if he had been diagnosed with anything or whether he was hearing voices, and defendant responded:  "I, I can't tell you right now because I drink too much."  He stated that he had used a kitchen knife, and said:  "I'm not holding the knife.  I know that's evidence.  So I don't know what to do with that.  Please tell me."  The operator instructed him to stay on the phone and not to pick up the knife.  Defendant then provided instructions on how the police could get into the apartment complex.

When the operator asked again whether defendant had any mental illness, he said he had high blood pressure and "mental problem causing [*sic*] by the high blood pressure."  He then clarified:  "My mental problem causing [*sic*] by my girlfriend."  He said he had not been diagnosed by a doctor.  He said he took medicine for high blood pressure, and that he had taken a sleeping pill the night before.

---

[3] The quotations in English are from the translator on the phone call.  The transcript in the record does not include an independent translation of defendant's statements.

### 3. *Police Investigation*

Police arrived while defendant was on the phone with the 911 operator. The operator instructed defendant to go to the front door of the apartment with his hands up. Police outside the apartment yelled for defendant to exit with his hands in sight. Defendant obeyed, and police took him into custody. Defendant had an "unsteady gait" and his shirt was covered in blood. He had blood on his hands, and his left index finger had suffered a significant cut. The parties stipulated that analysis of blood drawn from defendant at 7:28 a.m. revealed a blood alcohol level of 0.14 percent and showed the presence of Xanax and blood pressure medication.

Upon entering the apartment, police found Zheng's body lying face down on the bedroom floor with a curtain panel over her head. The body had suffered numerous knife wounds, including three potentially fatal stab wounds to the neck and chest area. A large kitchen knife was found near the bed. The parties stipulated that the knife was used to kill Zheng. Police found blood in every room of the apartment.

Neighbors in the apartment below heard several loud thuds and crashing noises from Zheng's apartment around 1:10 a.m. They also heard sounds like a woman crying or moaning, and yelling or arguing in a language other than English. The yelling or argument lasted around 10 or 15 minutes. It was not the first time the neighbors had heard arguments coming from Zheng's apartment.

### 4. *Defendant's Statements to His Brother*

Defendant's brother, Paul Hsu, testified for the prosecution as follows.[4] Defendant had worked for Hsu's computer company, but the company went bankrupt in 2001. As defendant struggled financially, he had difficulty transitioning to a less extravagant lifestyle. Defendant began living on his mahjong winnings. He also

---

[4] Hsu testified through a Mandarin interpreter. All quotes of Hsu's testimony are from the interpreter's English translation.

gambled at casinos. He lost his house and declared bankruptcy at least once. Zheng was giving him money, and he felt bad about it.

Hsu spoke to defendant in jail shortly after Zheng's death. According to Hsu, defendant recounted the events leading up to the killing as follows. Zheng had invited defendant to her apartment that evening. Defendant resisted at first, but he then relented, whereupon Zheng picked him up and drove them to her apartment. They were both drinking a lot of wine. Zheng was taking a shower, and when she came out, she started cursing defendant's wife using profanities in a loud voice. Zheng said, "Fuck you. That silly cunt at your house. She thought that you spent money to buy me an LV bag." Defendant told her not to say that, but Zheng repeated the profanity. Defendant told her, "Don't say that again." Defendant warned her two or three times, but Zheng kept repeating the same profanities. Defendant went to the kitchen to get a knife and warned Zheng not to say it again, but Zheng repeated it. Defendant then killed Zheng with the knife. Hsu and defendant talked about what had made Zheng angry at defendant's wife. Defendant said it was probably because his wife had seen Zheng at the supermarket the day before. Hsu could not remember whether defendant said it was his wife or Zheng who was carrying a name brand handbag.

5. *Expert Testimony on the Effects of Alcohol and Xanax*

James Norris, a forensic scientist, testified for the defense concerning the effects of alcohol and Xanax. Based on the results of defendant's blood level analysis, Norris estimated that a person in similar circumstances would have had a blood alcohol concentration of about 0.26 percent around the time of the offense. He testified that most people with that alcohol level would show symptoms of intoxication associated with a person who is "drunk." They would have some difficulty knowing what is going on around them, but not to the degree of being comatose. Their ability to recall events would also be affected. There is an effect of alcohol-induced amnesia, which is sometimes called a "blackout." For example, in the morning, a person may not

remember what happened the night before. A person may also become intoxicated to the point where they are physically active, but they are not conscious of it. Norris also testified that Xanax, like alcohol, is a central nervous system depressant. When combined, the effects of Xanax and alcohol are additive, meaning that Xanax would exacerbate the effects of alcohol.

On cross-examination, Norris testified that he did not know if defendant suffered from alcohol-induced amnesia regarding his killing of Zheng. The prosecutor questioned Norris about various statements defendant made in the 911 call and whether they showed that he recalled how he killed Zheng. Norris testified that defendant's statement that the victim was yelling at him and his acknowledgement of the knife as evidence show that he knew and recalled what he had done. However, defendant's statement to the effect that he did not know what he had done supported the possibility of alcohol-induced amnesia. Norris agreed that defendant's statements to his brother recounting the facts of the killing were inconsistent with alcohol-induced amnesia. On redirect, Norris agreed that it was possible defendant did not know what was happening at the time of the offense, but that he pieced it together in the time between the killing and the 911 call.

Dr. Douglas Tucker testified for the prosecution as an expert on the combined effects of alcohol and drugs. He testified that a person experiencing a blackout may be physically active and may have short-term memory, but the memories do not get converted into long-term memory. Based on a hypothetical question, Dr. Tucker testified that a person calling 911 at 2:36 a.m. and describing what happened at 1:10 a.m., followed by recounting the events to a relative at a later time, was not consistent with alcohol-induced amnesia. He testified that if a memory has not moved into long-term memory, it cannot be retrieved at a later time. The fact that defendant recalled the event at a later time showed that it had moved into his long-term memory. Based on his review of the 911 call and defendant's statements to his brother, Dr. Tucker testified "with medical certainty" that defendant had not suffered from an alcohol-related blackout.

8

On cross-examination, Dr. Tucker testified that a "brownout" is a fragmentary blackout, where some events can be recalled, but memory is hazy. For some people who experience a brownout, recall can get better over time. Dr. Tucker testified that it was possible, but unlikely, that defendant had suffered from a brownout. On redirect, Dr. Tucker opined with "reasonable medical certainty" that defendant did not suffer a blackout or brownout.

B. *Procedural Background*

On April 19, 2012, the prosecution filed an information charging defendant with murder. (§ 187.) The information further alleged that defendant personally used a deadly and dangerous weapon—a knife—in the commission of the offense. (§ 12022, subd. (b)(1).) Defendant pleaded not guilty. He also pleaded not guilty by reason of insanity.

On February 20, 2013, the jury found defendant guilty of second degree murder and found the deadly weapon use allegation to be true. Following the sanity phase of the trial, the jury found him sane at the time of the offense. On April 26, 2013, the court sentenced defendant to a term of 15 years to life for the murder conviction with a consecutive one-year term for the enhancement.

## II. DISCUSSION

A. *Exclusion of Testimony on the Cultural Significance of the Victim's Statements*

Defendant contends the trial court erred by excluding expert testimony that the words Zheng used to describe his wife were "uniquely provocative" in Chinese culture. Defendant argues the testimony was relevant to the jury's determination of whether he was guilty of voluntary manslaughter based on a defense of heat of passion. He argues the ruling denied him the right to present a defense in violation of the Fifth, Sixth, and Fourteenth Amendments. The Attorney General argues that the trial court properly excluded the testimony because the evidence was irrelevant to the objective component of the heat of passion defense. The Attorney General concedes that the evidence arguably could have been relevant to defendant's subjective state of mind, but she argues

9

that defendant never testified that Zheng's statements caused him to act from passion instead of reason.

We conclude that the trial court did not abuse its discretion by excluding the expert testimony. Even assuming the trial court erred, any error was harmless because defendant did not demonstrate a reasonable likelihood that the jury would have reached a more favorable outcome if the testimony had been admitted.

### 1. *Relevant Procedural Background*

Defendant moved in limine to admit expert testimony from Dr. David Kan, a forensic psychiatrist and medical examiner who had interviewed appellant about his mental state at the time of the crime, among other things. Dr. Kan is second-generation Taiwanese and "well versed in Chinese culture from both personal and professional experience . . . ." Defendant proffered testimony from Dr. Kan that Zheng's words were " 'uniquely provocative,' similar to using the 'N-word' in American culture." Dr. Kan would further opine that "a raw translation is not sufficient in demonstrating the meaning, implications and culturally-specific impacts that certain phrases or turns of speech can have on an individual."

At oral argument on the motion, defense counsel argued that the testimony was relevant to the jury's consideration of "whether a person of average disposition in the same position and knowing the same facts would have acted from passion rather than judgment." He referred to cases in which the jury was allowed to consider whether the defendant "reacted as a typical Asian-American would; as a typical Japanese person would." The prosecutor opposed the motion on the ground that defendant had failed to lay a sufficient foundation for Dr. Kan's testimony. The prosecutor also opposed a heat of passion instruction.

The trial court ruled that the proffered testimony was not relevant to the issue of whether the provocation was such that a reasonable person would act out of passion rather than reason. The trial court noted that the standard was an objective one based

10

solely on how a reasonable person would act: "It is a reasonable man. It is not a reasonable drunk person, and it is not a reasonable Taiwanese person or reasonably drunk Taiwanese person." In support, the court cited *People v. Romero* (1999) 69 Cal.App.4th 846 (*Romero*) [expert testimony on sociology of poverty and Hispanic culture was irrelevant to whether defendant believed he was in imminent danger and whether his belief was objectively reasonable]. However, the court added that if defendant were to testify that he acted out of passion rather than reason in reaction to Zheng's words, then the expert's testimony might be relevant and admissible to the subjective element of heat of passion. The court also ruled that if defendant so testified, then the court would hold a hearing under Evidence Code section 402 to determine whether the expert's testimony was admissible. In his testimony, however, defendant was unable to recall how he felt or what he said in reaction to the victim's statements.

At the close of evidence, the trial court instructed the jury on first degree murder, second degree murder, voluntary manslaughter, and involuntary manslaughter. The court also used the language of CALCRIM No. 570 to instruct the jury on the defense of heat of passion. In closing argument, defendant argued that he was guilty of "heat of passion manslaughter" because the victim's statements caused him to react from passion rather than reason, thereby negating malice.

2. *Legal Principles*

" 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) But expert testimony, even when relevant, is limited to an opinion that is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).)

Defendant argues that the excluded testimony was relevant to prove his defense of heat of passion. Heat of passion is "a state of mind caused by legally sufficient

11

provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*People v. Beltran* (2013) 56 Cal.4th 935, 942 (*Beltran*).) "[T]he provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection." (*Id.* at p. 949, original italics.) But the provocation is not required to be so great as to be "of a kind that would cause an ordinary person of average disposition *to kill*." (*Id.* at p. 935, original italics.)

The provocation requirement has two components—" 'both an objective and a subjective component. [Citation.] First, the defendant must actually, subjectively, kill under the heat of passion.' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 584 (*Manriquez*).) The passion aroused need not be anger or rage, but may be any violent, intense, high-wrought, or enthusiastic emotion other than revenge. (*People v. Breverman* (1998) 19 Cal.4th 142, 163 (*Breverman*).) " 'But the circumstances giving rise to the heat of passion are also viewed objectively. As [the California Supreme Court] explained long ago . . . , "this heat of passion must be such a passion as would naturally be aroused in the mind of an ordinarily reasonable person under the given facts and circumstances," because "no defendant may set up his own standard of conduct and justify or excuse himself because in fact his passions were aroused, unless further the jury believe that the facts and circumstances were sufficient to arouse the passions of the ordinarily reasonable man." ' [Citation.]' " (*Manriquez*, *supra*, at p. 584.) No specific type of provocation is required. (*Breverman*, *supra*, 19 Cal.4th at p. 163.) Legally sufficient provocation may be entirely verbal, including words of abuse, insult or reproach. (*People v. Valentine* (1946) 28 Cal.2d 121, 140; *People v. Le* (2007) 158 Cal.App.4th 516, 526.)

3. *Standard of Review*

" 'In determining the admissibility of evidence, the trial court has broad discretion.' [Citation.] In particular, a trial court's decision on the admissibility of expert testimony is reviewed for an abuse of discretion. [Citation.]" (*People v. Lucas* (2014) 60 Cal.4th 153, 226.)

4. *Exclusion of the Expert Testimony*

Defendant contends the trial court should have admitted the proffered expert testimony with respect to the objective component of his heat of passion defense. He argues that the objective component is defined according to how a reasonable person would react under the same "facts and circumstances." Defendant argues that these facts and circumstances included his cultural heritage, about which the expert would have testified. Defendant contends this is distinct from redefining the "reasonable person" standard to be that of a "reasonable Taiwanese person." To support his argument, defendant relies primarily on *People v. Humphrey* (1996) 13 Cal.4th 1073 (*Humphrey*).

*Humphrey* concerned the admission of expert testimony regarding battered women's syndrome, since renamed "intimate partner battering." (See, e.g., *People v. Dowdell* (2014) 227 Cal.App.4th 1388, 1416.) The court held that such expert testimony is generally relevant to the subjective existence and objective reasonableness of the defendant's belief in the necessity of self defense. (*Humphrey*, *supra*, 13 Cal.4th at p. 1076.) The court observed that the objective reasonableness of the defendant's belief must be considered from the perspective of " 'a reasonable person in a similar situation and with similar knowledge.' " (*Id.* at pp. 1082-1083 [quoting CALJIC No. 5.50].) Furthermore, " 'a defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind.' " (*Humphrey*, at p. 1083 [quoting *People v. Smith* (1907) 151 Cal. 619, 628].) Accordingly, the court held: "Although the ultimate test of reasonableness is objective, in determining whether a reasonable person in defendant's position would have believed in the need to defend, the jury must consider all of the relevant circumstances in which defendant found herself." (*Humphrey*, at p. 1083.) The court rejected the Attorney General's claim that it was "changing the standard from objective to subjective, or replacing the reasonable 'person' standard with a reasonable 'battered woman' standard." (*Id.* at p. 1087.) Thus,

13

the court noted:  "Our decision would not, in another context, compel adoption of a ' "reasonable gang member" standard.' " (*Ibid*.)

Here, defendant argues that evidence concerning the provocative nature of the victim's statements in Chinese culture, like the expert testimony in *Humphrey*, was relevant to prove the external circumstances in which defendant found himself and how those circumstances "might [have been] expected to operate on his mind."  (*Humphrey*, *supra*, 13 Cal.4th at p. 1083.)  Arguably, this is a valid theory of relevance.  But the defendant in *Humphrey* also gave testimony establishing her own subjective belief in the necessity of self defense.  As three concurring justices noted in *Humphrey*:  "Expert testimony is [. . .] not relevant until the defendant puts at issue conduct or circumstances the jury might not otherwise understand as the basis for self-defense. . . ."  (*Id.* at p. 1098 [conc. opn. of Brown, J.].)  At the very least, then, a defendant would have to adduce *some* testimony or evidence setting forth a basis for the assertion of the defense at issue.  Here, for example, defendant could have put forth evidence establishing that he subjectively acted out of passion rather than reason due to the provocative nature of the victim's statements.

Defendant made no such showing.  He could not recall precisely how he reacted or what he said in response to the victim's insults.  When his attorney asked him how Zheng's statements made him feel, he responded:  "I cannot describe.  Up until today, I still don't know how."  When the prosecutor asked him on cross-examination whether he killed Zheng because of her statements, defendant responded:  "I really don't know if that was why."  Thus, the record holds no evidence showing defendant killed Zheng out of passion rather than reason.  Defendant points to statements he made to his brother:  "[A]fter the victim called his wife a 'silly cunt' he warned her not to say it again but she kept saying it, and it was only after her repetition of this slur that he rushed to the kitchen to get a knife, warned her again not to repeat the insult and then stabbed her when she did."  This suggests defendant acted out of *anger*, but the presence of anger alone is not

sufficient to establish heat of passion. Heat of passion is established not solely by the presence of emotion, but by the lack of reflection or rational thought—in other words, "unconsidered reaction." (*Beltran*, *supra*, 56 Cal.4th at pp. 942, 949.) It is possible to formulate one's actions based on reflection and anger at the same time.

The trial court partly based its ruling on the lack of evidence that defendant acted from unconsidered reaction. Because there is no evidence in the record establishing the subjective element of heat of passion (i.e., a lack of reflection or rational thought), the trial court did not abuse its discretion by excluding the proffered expert testimony.

Even assuming the trial court erred, it is not reasonably probable the jury would have reached a more favorable outcome in the absence of error. The jury was instructed on the subjective element of heat of passion, but defendant put forth no evidence on which the jury was likely to base such a finding. Accordingly, any error would have been harmless under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). Defendant contends the proper standard for harmless error is the "beyond a reasonable doubt" standard set forth in *Chapman v. California* (1967) 386 U.S. 18, because the error denied him the right to present a defense. We disagree. The trial court instructed the jury on heat of passion, and defense counsel argued it in closing. The trial court's ruling solely affected the admission of expert testimony; defendant was not denied the right to present a defense. Accordingly, any error would have violated solely state law rules of evidence, not the federal constitution. For these reasons, we conclude any error was harmless, and defendant's claim is without merit.

B. *Instructions on Involuntary Manslaughter Based on Unconsciousness*

Defendant contends the trial court erred by giving the jury conflicting instructions on the level of intent required for a verdict of involuntary manslaughter based on unconsciousness. Specifically, he argues that the court erroneously instructed the jury that a verdict of involuntary manslaughter requires general intent, which element is not required for the jury to find the defendant guilty of involuntary manslaughter based on

15

voluntary intoxication. Because the jury could not have found that defendant harbored general intent while unconscious, defendant contends the general intent instruction effectively negated his unconsciousness defense. The Attorney General, relying on *People v. Boyer* (2006) 38 Cal.4th 412 (*Boyer*), contends there was no reasonable likelihood the jury misunderstood the instructions.

We are bound by the Supreme Court's holding in *Boyer*. (*Auto Equity Sales, Inc. v. Superior Court of Santa Clara County* (1962) 57 Cal.2d 450, 455.) Based on *Boyer*, we agree with the Attorney General that there was no reasonable likelihood the jury was confused by the trial court's instructions. But even assuming the instructions were erroneous, defendant cannot show he was prejudiced.

### 1. *Relevant Procedural Background*

The trial court instructed the jury on the level of intent required for involuntary manslaughter based on CALCRIM No. 252, as follows: "The crime and other allegation charged in Count 1 require proof of the union or joint operation of act and wrongful intent. The following lesser crimes and allegations require general criminal intent: [. . .] The lesser crime of involuntary manslaughter also requires general criminal intent. For you to find a person guilty of a lesser crime, or to find the allegation true, that person must not only commit the prohibited act, but must do so with wrongful intent. A person acts with wrongful intent when he or she intentionally does a prohibited act. However, it is not required that he or she intend to break the law." Defendant lodged no objection.

The court subsequently instructed the jury on unconsciousness due to voluntary intoxication based on CALCRIM No. 626, as follows: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill or the defendant acted with deliberation and premeditation. A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance, knowing that it could produce an intoxicating factor, willingly assuming the

16

risk of that effect. You may not consider evidence of voluntary intoxication for any other purpose. Voluntary intoxication may cause a person to be unconscious of his or her actions. A very intoxicated person may still be capable of physical movement, but may not be aware of his or her actions or the nature of those actions. A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance, knowing that it could produce an intoxicating effect or willingly assuming the risk of that effect. When a person voluntarily causes his or her own intoxication to the point of unconsciousness, the person assumes the risk that, while unconscious, he or she will commit acts inherently dangerous to human life. If someone dies as a result of the actions of a person who was unconscious due to voluntary intoxication, then the killing is involuntary manslaughter. Involuntary manslaughter has been proved if you find beyond a reasonable doubt that: One, the defendant killed without legal justification or excuse; Two, the defendant did not act with the intent to kill; Three, the defendant did not act with a conscious disregard for human life; And four, as a result of voluntary intoxication, the defendant was not conscious of his actions or the nature of those actions. The People have the burden of proving beyond a reasonable doubt that the defendant was not unconscious. If the People have not met this burden, you must find the defendant not guilty of murder or voluntary manslaughter."

The court then instructed the jury on a misdemeanor manslaughter theory of involuntary manslaughter: "An unlawful killing resulting from a willful act committed without intent to kill and without conscious disregard of the risk to human life is involuntary manslaughter. The defendant committed involuntary manslaughter if: One, the defendant committed a crime; Two, the defendant committed the crime with criminal negligence; And 3, the defendant's acts unlawfully caused the death of another person. The People allege that the defendant committed a crime that posed a high risk of death or great bodily injury because of the way it was committed, to wit: Brandishing a deadly [*sic*] or deadly weapon."

17

In closing argument, defense counsel argued that the jury could find defendant guilty of involuntary manslaughter based on unconsciousness, and that unconsciousness would negate intent: "There is another form of manslaughter which the evidence equally supports and that's involuntary manslaughter. [. . .] [I]nvoluntary manslaughter occurs when you are acting even though you don't realize you're acting. You're unconscious in the legal sense of the word, not the medical sense. The medical sense means you're just out, you're inert. The legal sense is you are acting but you're not aware of your actions by way of voluntary intoxication. That also negates intent." The prosecutor in her closing argument agreed that the law allowed for a verdict of involuntary manslaughter based on unconsciousness due to intoxication, but she argued that the evidence did not support a finding of unconsciousness.

2. *Legal Principles*

"When a person renders himself or herself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his or her negligence in self-intoxicating to that point, and is treated as involuntary manslaughter." (*People v. Ochoa* (1998) 19 Cal.4th 353, 423.) The trial court has a sua sponte duty to instruct on voluntary intoxication causing unconsciousness if there is evidence to support such a finding. (*People v. Graham* (1969) 71 Cal.2d 303, 317, overruled on other grounds in *People v. Ray* (1975) 14 Cal.3d 20, 29, fn. 7.) However, in a noncapital case, a trial court's erroneous failure to fully instruct the jury on a lesser included offense is reviewed for prejudice under *Watson*, *supra*, 46 Cal.2d 818: "A conviction of the charged offense may be reversed in consequence of this form of error only if, 'after an examination of the entire cause, including the evidence' [citation], it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred [citation]." (*Breverman*, *supra*, 19 Cal.4th at p. 178.)

3. *Defendant Suffered No Prejudice From the Court's Instructions*

18

The California Supreme Court previously considered the argument raised here in *Boyer*, *supra*, 38 Cal.4th 412. In *Boyer*, the jury was instructed with a version of CALJIC No. 8.47 that if Boyer, while unconscious as the result of voluntary intoxication, killed without malice or an intent to kill, he would be guilty of involuntary manslaughter. (*Boyer*, *supra*, at p. 473.) The trial court further instructed the jury on a misdemeanor manslaughter theory of involuntary manslaughter based on CALJIC No. 8.45. Finally, the trial court instructed the jury that involuntary manslaughter was a general intent offense, requiring a union or joint operation of act or conduct and general intent.

On appeal, Boyer put forth an argument identical to defendant's argument here. (*Boyer*, *supra*, 38 Cal.4th at pp. 473-474.) The California Supreme Court rejected Boyer's claim on the basis that there was no reasonable likelihood the instructions confused or misled the jury about the connection between unconsciousness due to voluntary intoxication and involuntary manslaughter. (*Id.* at p. 474.) The court noted that the jury had been specifically instructed that an unintentional killing while unconscious due to voluntary intoxication was involuntary manslaughter. The court further noted that the jury had been instructed on a distinct theory of involuntary manslaughter, e.g., misdemeanor manslaughter. The court held: "Under these circumstances, there seems little chance the jury would conclude that the instruction defining involuntary manslaughter as a general intent crime *negated* the instruction defining an unintentional homicide while unconscious from voluntary intoxication as involuntary manslaughter, and thus precluded such a conviction based on voluntarily induced unconsciousness." (*Ibid.*, original italics.) The same circumstances are present in this case such that the court's logic in *Boyer* applies with equal force here.

Defendant relies on a passage in *Boyer* wherein the California Supreme Court noted that the trial court had orally modified the relevant instruction. With respect to involuntary manslaughter, the trial court had specified that general intent is presumed insofar as the defendant committed the underlying criminal act. (*Boyer*, *supra*,

19

38 Cal.4th at p. 475.)  Defendant argues that *Boyer* is thereby distinguishable because the trial court here made no such modification.  But the fact of the trial court's oral modification in *Boyer* was not dispositive in the court's analysis.

Even assuming the trial court's instructions were erroneous, defendant cannot show a reasonable probability the jury would have reached a more favorable outcome in the absence of such error.  The prosecution's expert testified to a "medical certainty" that defendant did not suffer from alcohol-induced amnesia because he was later able to recount specific facts of the offense, e.g., the 911 call and his conversation with his brother while in jail.  By contrast, defendant's expert provided little or no basis to support a finding that defendant was unconscious at the time of the killing.  Based on this record, it is not reasonably probable the jury would have found defendant was unconscious if it had been instructed as defendant now contends it should have been instructed.

For these reasons, we conclude defendant's claim of instructional error is without merit.

### III.  DISPOSITION

The judgment is affirmed.

20

_____
Márquez, J.

WE CONCUR:

_____
 Bamattre-Manoukian, Acting P. J.

_____
 Grover, J.