Filed 7/29/16  P. v. Morales CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BILLY A. MORALES,<br><br>    Defendant and Appellant. | B263076<br><br>(Los Angeles County<br>Super. Ct. No. BA415281) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Anne H. Egerton, Judge.  Affirmed.

Randy S. Kravis, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## SUMMARY

This case stems from the stabbing death of Rodney Craig at a homeless encampment in downtown Los Angeles. Appellant Billy A. Morales appeals from a judgment entered after a jury convicted him of second degree murder (Pen. Code, § 187, subd. (a)) and found true the allegation that appellant personally used a deadly and dangerous weapon (a knife) in the commission of the offense (§ 12022, subd. (b)(1)).[1] He was sentenced to an aggregate term of 16 years to life in state prison.

On appeal, appellant contends the trial court committed reversible error when it required him to testify before it would allow the introduction of expert testimony on Post Traumatic Stress Disorder (PTSD), excluded expert testimony on homeless culture, excluded the out-of-court statement of a witness about the victim's alleged claim of gang membership, admitted evidence of a prior conviction for robbery, and instructed the jury on flight. Appellant also contends that to the extent the alleged errors individually are not prejudicial, reversal is required under the cumulative error doctrine. We affirm.

## FACTS AND PROCEEDINGS

### I. Prosecution Evidence

#### A. Georgia Pearce

For approximately two months prior to Craig's death on August 17, 2013, Georgia Pearce had been sleeping at a homeless encampment on Wilshire Boulevard between Hope Street and Grand Avenue. Anywhere from five to 15 people slept at the encampment on any given night,[2] but generally the same core group slept at the location. Members of the encampment were close-knit and considered themselves to be a family. Appellant also slept at this encampment, and Pearce considered him to be like a brother.[3]

---

[1] All further statutory references are to the Penal Code unless otherwise noted.

[2] The City of Los Angeles allowed the homeless to set up camps to sleep between 9:00 p.m. and 6:00 a.m.

[3] Pearce met appellant in New York in 2012, but did not know him well until after they met again in Los Angeles in February 2013.

The encampment members felt the location of the camp was safer than other locations because nearby buildings had security cameras, security guards and police patrolled the area, and it was located away from Skid Row and its drug trafficking and associated violence. The group allowed a person to sleep at the encampment if he or she was known by another camper, was "peaceable," and agreed not to harass anyone walking on the street or engage in any activity that might get someone arrested. For safety reasons, the group forbade persons whom none of the campers knew from sleeping at the encampment because they might be involved with drugs or trying to steal from members. There was no member designated to enforce this rule, but any member who felt uncomfortable could either confront a newcomer or consult with other encampment members. Pearce had worked separately with appellant and with Anthony Johnson, another encampment member, to remove strangers from the camp. Prior to the events of August 17, 2013, there had been several occasions when non-members tried to cause problems with members and their tents or to vandalize the area to get the members in trouble.

Based on her five years as a homeless person in almost every major city in the continental United States, Pearce testified there was an unwritten code of conduct among experienced homeless people to respect another person's space by staying at least a body's length away from the person and his or her tent, sleeping bag, or park bench in order to avoid inadvertently waking a sleeping person and risking a defensive response. Pearce also testified that in her experience homeless people commonly carried knives or other weapons for protection. Pearce knew appellant had a knife about 14 inches long, that he kept in a sheath in his bag.

When Pearce arrived at the camp on August 17, 2013, just after 9:00 p.m., the victim--a stranger to the encampment later identified as Rodney Craig--was already at the encampment along with five or more members. Two or three tents were already set up, and members were in the process of erecting other tents. Pearce saw Craig lying "too close" to one of the tents, with his body parallel to and partially leaning on the member's

3

tent.[4]  Pearce initially said nothing to Craig, but she and other encampment members, including appellant, talked about what they should do about him.  Uncomfortable because Craig was a stranger, the group decided to ask him to leave.  An encampment member approached Craig and asked him to leave, but he ignored the member and remained lying on the ground.

Pearce then approached Craig and asked him to leave, explaining that the encampment members were not comfortable with his presence.  Craig did not respond, so Pearce repeated her request.  As Craig began standing up, Pearce backed away with others members behind her to give him space to leave without feeling threatened.  Craig started walking with unsteady, "hobbling" and "loping" movements, almost as if he were drunk.  Without speaking to anyone in particular, Craig reached into his pocket and muttered about cutting someone.  Turning away from Pearce, who was closest to him, Craig removed his empty hands from his pockets and kicked at, but did not strike, Pearce's dog.  Angered, Pearce and other encampment members chased Craig.

Pearce stopped running to check on her dog as appellant and Johnson continued to chase Craig.  Craig turned into the street and started running back towards the encampment, where he tripped and fell onto a member lying on the sidewalk.  As Craig was prone on the ground with his face down, both appellant and Johnson punched him in the face and head.  With blood on his face, Craig stood and ran into the street, where Pearce lost sight of him.

When police officers interviewed Pearce, she never told them that Craig stated he was going to cut someone.

### B.  Surveillance Video

Surveillance videos of portions of the incident were played for the jury.  One video showed Pearce leaving a group of encampment members presumably to talk to Craig, appellant waiting with the group while holding a large knife behind his back, and

---

[4] Pearce was not sure if it was appellant's tent or another person's.

Craig walking and then running away from the encampment with his hands out of his pockets while appellant, Pearce, and Johnson chased him.[5]

A second surveillance video showed Craig running further down the block away from the encampment with both hands out of his pockets as appellant and Johnson chase him, Pearce stopping to pet her dog, and Craig running back toward the encampment with appellant and Johnson still chasing him.

The first video then showed Craig running into the encampment with appellant and Johnson close behind, tripping, and falling on a figure on the ground. The video showed Johnson kicking and punching Craig, appellant kicking Craig once and making a stabbing motion into Craig's midsection while Craig is on the ground, and appellant walking away. The video then showed Craig getting up and going into the street.

A third surveillance video showed Craig collapsing in the street, appellant approaching Craig and bending over him, appellant jogging away, and police officers arriving and detaining Johnson.

The first video showed appellant picking up a bag and leaving the encampment.

**C. The Investigation**

When Officer Ortiz returned to the crime scene area on August 18, 2013, he found appellant in the sole tent remaining at the encampment. Officer Ortiz and his partner interviewed appellant.

Based on Officer Ortiz's experience, it was not common for homeless people to carry weapons, as most were on parole or probation and knew the consequences of being caught with a weapon. Craig was about 6 feet 1 inch in height, weighed about 260 pounds, and had a "large build." Appellant was 5 feet 8 inches in height and weighed 199 pounds. Johnson was about 5 feet 3 inches in height and weighed about 150 pounds.

---

[5] Appellant wore a short-sleeved T-shirt and jeans; Johnson wore sweatpants and shoes, but no shirt.

### D. Medical Examiner Expert Testimony

Craig died as result of a stab wound that punctured the pericardium and right ventricle of the heart. Craig's left palm had an injury consistent with a defensive wound and his face had injuries consistent with having been punched.

## II. Defense Case

### A. Appellant's Testimony

Appellant testified at trial to having been sexually and physically abused as a child, subjected to repeated bullying, and diagnosed with PTSD as a teenager. He testified about his PTSD symptoms, the effect of PTSD on him, and his learning disabilities. He also testified he was convicted of robbery in New York in 2001 when he was 19 years old and was raped while incarcerated for that crime.

The encampment at Wilshire Boulevard and Hope Street was considered to be a "safe zone," given the presence of security guards in nearby buildings. Pearce was like a sister to him and appellant considered Pearce's dog to be family.

On the evening of August 17, 2013, appellant saw Craig walk into the encampment and lie on the ground about two to three feet from the side of appellant's tent. Appellant had never seen Craig before that night. Because Craig was too close to his tent, appellant moved his tent a couple of spaces away from Craig to avoid problems. When he did so, Craig repositioned himself so that he was lying on the tip of appellant's tent.

Appellant called a meeting with the encampment members, including Pearce and Johnson, stating he felt uncomfortable with Craig's presence. The group decided to ask Craig to leave. In the presence of the group, Pearce approached Craig with the request but he did not respond.

Johnson then told Craig, "If you're going to be here, there's no drinking, there's no drugs, there's nothing, there's no stealing." Craig stood up and, acting "belligerent," put his hand in his pocket and told the group, "Fuck you, I'm going to cut you." Appellant did not see Craig remove anything from his pocket but believed Craig had a weapon. Craig then told the group, "Fuck you, where you from? Where you from? I'm

a Blood from Compton." Appellant felt scared because gang members were known to carry weapons and commit drive-by shootings. Because Craig acted like he had a weapon, appellant retrieved his knife from his tent and held it sheathed behind his back to "match" the weapon he believed Craig had.

As Craig was leaving the encampment, he kicked at Pearce's dog. Although appellant could not see if Craig's kick connected with the dog, appellant was upset by Craig's conduct and joined Pearce and Johnson in chasing Craig. When the chase began, appellant had a flashback to his rape while incarcerated, because Craig looked like one of his rapists.

Believing Craig had a weapon and was a danger to encampment members, appellant intended to chase Craig off the block. When Craig reached the end of the block, however, he turned around and ran back toward Pearce. Appellant intercepted Craig, who still had one hand in his pocket, and unsheathed his knife because he did not know Craig's intentions.

Craig then tripped and fell on a member lying on the sidewalk. Johnson stood over Craig and punched him several times. Without thinking, appellant kicked Craig once. When one of Craig's hands reached into his pocket, appellant made a "split [second] decision" and stabbed Craig even though appellant did not see a weapon. Appellant did not feel it was safe to use only his hands or feet and was afraid Craig would harm him or Johnson, or engage in a rampage at the encampment. At that moment, appellant was not thinking and his PTSD "kicked in." Appellant never saw Craig with a weapon.

After stabbing Craig, appellant backed away. Craig rose to his feet and went into the street, telling the encampment members that he was a Blood from Compton and was going to shoot them, before falling to the ground.

Appellant went over to Craig and leaned over him to see if he was okay. When police officers arrived and detained Johnson, appellant twice approached the officers because he was worried about Craig and wanted to explain what had occurred, but was told both times to step back.

7

Unaware Craig was dead, appellant took his knife and ran to Echo Park, where he threw his knife into the lake. Appellant was crying, anxious, and high on adrenaline.

When Officer Ortiz interviewed appellant, he initially claimed he was not present during the incident. Appellant also falsely stated that Johnson was the person who had stabbed Craig. During the interview, appellant never told Officer Ortiz that he heard Craig state he was part of a gang, heard Craig threaten to cut appellant or other encampment members, or saw Craig's hands in his pockets as soon as he rose from the ground. Appellant admitted to Officer Ortiz he never saw Craig holding anything in his hands, but also stated that when the confrontation escalated, Craig was a major threat and appellant was on the defensive.

**B. Expert Witness Nancy Kaser-Boyd**

Clinical and forensic psychologist Dr. Nancy Kaser-Boyd testified appellant suffered from chronic PTSD, had intellectual and learning disabilities, and seemed "childlike." PTSD is an anxiety disorder and can cause flashbacks, avoidance of traumatic memories, and hypervigilance to danger. PTSD can be triggered by reminders of past trauma. Dr. Kaser-Boyd described various traumatic events appellant experienced as a child and opined he was re-victimized throughout his life.

As to the stabbing on August 17, 2013, appellant told Dr. Kaser-Boyd he had flashbacks of the people who hurt him in the past, and Craig's face reminded him of one of the men who had raped him in prison. Appellant also told Dr. Kaser-Boyd that when Craig made threatening gang statements, appellant's "mind sort of went off," which Dr. Kaser-Boyd interpreted as appellant experiencing thoughts of all of the other times he had been hurt. Dr. Kaser-Boyd inferred appellant's prior experiences affected how he responded when he saw Craig try to kick his friend's dog. An individual suffering from chronic PTSD as well as learning, intellectual, and developmental disabilities would have an adrenaline response in a situation perceived as threatening.

8

## III. Rebuttal

Officer Ortiz did not find a knife or gun during an examination of Craig's property. Craig did not have any tattoos that would lead Officer Ortiz to believe Craig was a gang member.

## IV. Conviction and Sentence

The jury convicted appellant of second degree murder and found true the special allegation that he personally used a deadly and dangerous weapon (a knife) in the commission of the offense. (§§ 187, subd. (a), 12022, subd. (b)(1).) After denying defense counsel's motion for a new trial and request to stay or strike the weapon enhancement, the trial court sentenced appellant to an aggregate term of 16 years to life in prison (15 years to life for the murder and one year for the weapon enhancement).

## DISCUSSION

## I. Evidence of Self-Defense Absent Appellant's Testimony

We find no error in the trial court's conclusion that, prior to appellant's testimony, substantial evidence of self-defense did not exist.[6]

To support a self-defense instruction, there must be substantial evidence that the defendant (1) reasonably believed that he was in imminent danger of suffering bodily injury or of being touched unlawfully; (2) reasonably believed that the immediate use of force was necessary to defend against that danger; and (3) used no more force than was reasonably necessary to defend against the danger. (*People v. Romero* (1999) 69 Cal.App.4th 846, 853.) In the case of perfect self-defense, the defendant has an honest and reasonable belief in the need to defend, while in the case of imperfect self-defense, the defendant has an actual but unreasonable belief in the need to defend. (*People v. Valenzuela* (2011) 199 Cal.App.4th 1214, 1227; *People v. Booker* (2011) 51 Cal.4th 141, 182; *People v. Randle* (2005) 35 Cal.4th 987, 994 ["'One acting in imperfect self-defense

---

[6] Appellant does not dispute that the trial court correctly held that substantial evidence of self-defense must be established before Dr. Kaser-Boyd's testimony on the effect of PTSD on appellant's perception of danger would be relevant.

9

. . . actually believes he must defend himself from imminent danger of death or great bodily injury; however, his belief is unreasonable'"].) In either case, self-defense "requires without exception that the defendant must have had an *actual* belief in the need for self-defense. . . . Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury." (*In re Christian S.* (1994) 7 Cal.4th 768, 783.)

Here, absent appellant's testimony, there was no substantial evidence that he actually believed--reasonably or unreasonably--that he or someone else was in imminent danger from Craig. Pearce's testimony and the video surveillance showed Craig was outnumbered, his movements were unsteady and "hobbling," he never had a weapon in his hand, he tried to run away, he did not fight back and, after tripping and falling, he was on the ground when appellant stabbed him.[7] Although Pearce testified that when Craig was leaving, he "reached into his pocket and muttered something about cutting someone" to the group, "all [Pearce] could gather was that he was unhappy about having to move."

Based on the evidence at the close of the prosecution's case, we find no error in the trial court's conclusion that, absent appellant's testimony, no substantial evidence supported the admission of expert self-defense evidence.[8]

---

[7] To the extent appellant argues his statements to the police supported his claim of self-defense, as appellant acknowledges, these out-of-court statements "qualified as hearsay [and] were not introduced into evidence by the prosecution." While appellant attempted unsuccessfully to introduce his out-of-court statements during trial as prior consistent statements, on appeal he makes new arguments for their admissibility, which we decline to consider. In any event, appellant's statements to police--that Craig was a "major threat," "acted like he had something," "had something pointy he was hiding," "he had something you know. So, I mean I didn't see it, but it's like, like he had something. You know, so like I said I was on the defense"--would not constitute substantial evidence that he, or another encampment member, was in imminent danger from Craig.

[8] The trial court did conclude that Dr. Kaser-Boyd could testify on the effect of PTSD on deliberation and premeditation without appellant testifying.

10

**II.     Exclusion of Expert Testimony on Homeless Culture**

Appellant next contends the trial court abused its discretion and violated his right to present a defense by excluding testimony from Dr. Nikolas Stefanidis, appellant's proposed expert on homeless culture.  Appellant argues Dr. Stefanidis's proposed testimony was beyond the common experience of the average layperson and thus helpful to the jurors.

"'Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense."'" (*Holmes v. South Carolina* (2006) 547 U.S. 319, 324.) Although this right can be abridged by evidence rules that infringe on the weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve, the ordinary rules of evidence generally do not impermissibly infringe on the accused's right to present a defense.  (*Id.* at pp. 324, 326-327; see *People v. Lucas* (2014) 60 Cal.4th 153, 270.)

Evidence Code section 801 limits expert testimony to that "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."  (Evid. Code, § 801, subd. (a).)  A "trial court has wide discretion to admit or exclude expert testimony. . . .  An appellate court may not interfere with the exercise of that discretion unless it is clearly abused."  (*People v. Manriquez* (1999) 72 Cal.App.4th 1486, 1492.)

Here, appellant sought to introduce testimony from Dr. Stefanidis on homeless culture and homeless encampments, including how homeless encampments work, the strong bonds between members, the dangers of being homeless, the safety created by encampments, the unwritten rule of homeless camps about personal space, and the reasonableness of feelings of discomfort and fear when personal space is infringed in camps.  Moreover, the proposed testimony would tend to show "why [appellant] reasonably believed that it was unsafe to have Mr. Craig there, and the fact that Mr.

11

Craig's response, by becoming threatening and becoming violent, was unreasonable, goes to self-defense, perfect and imperfect."

The trial court did not abuse its discretion when it excluded Dr. Stefanidis's testimony. A layperson can understand that being homeless and living on the street would make one vulnerable to potential violence from other homeless people and that members of a homeless encampment would be apprehensive about a stranger unknown to any of them sleeping in their camp, especially in close proximity to one of their tents.

Appellant contends testimony from an expert on homeless culture would be similar to testimony from experts on battered women's syndrome and on Child Sexual Abuse Accommodation Syndrome (CSAAS), which are both admissible. We disagree. In *People v. Humphrey* (1996) 13 Cal.4th 1073, the Supreme Court held that expert evidence on battered women's syndrome is admissible under Evidence Code section 1107,[9] but explained that its decision was not "changing the standard from objective to subjective, or replacing the reasonable 'person' standard with a reasonable 'battered woman' standard" for self-defense and that its decision "would not, in another context, compel adoption of a '"reasonable gang member" standard.'"[10] (*People v. Humphrey*, *supra*, 13 Cal.4th at p. 1087; see *People v. Romero* (1999) 69 Cal.App.4th 846, 854 [in murder case, affirming trial court's exclusion of expert testimony on Hispanic street-

---

[9] Evidence Code section 1107 states in part: "(a) In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge. [¶] (b) The foundation shall be sufficient for admission of this expert testimony if the proponent of the evidence establishes its relevancy and the proper qualifications of the expert witness."

[10] While appellant is correct that gang expert testimony has been admitted in a number of cases, the admissions have been in the context of proving gang enhancements, rather than the self-defense standard. (See, e.g., *People v. Gardeley* (1996) 14 Cal.4th 605, 617-620.)

fighter culture to support a self-defense theory and declining to adopt a separate standard].)

In the context of CSAAS, expert testimony "is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1301.) Appellant argues jurors might not understand why the presence of a stranger in a homeless camp might be perceived as a threat. But Dr. Stefanidis's testimony was not offered to rehabilitate a complaining witness, nor had appellant identified a misconception held by the jurors about the dangers of homelessness which needed to be addressed. (See *People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001-1002 [in spousal rape case, affirming trial court's exclusion of expert testimony on "make-up sex" and rejecting defendant's argument that the testimony was akin to CSAAS testimony].)

*People v. Minifie* (1996) 13 Cal.4th 1055, upon which appellant relies, is also distinguishable. There, the Supreme Court held in a murder trial that it was error for the trial court to exclude evidence defendant had been threatened by members of a group that the defendant believed was associated with the victim. Here, in contrast, appellant sought to introduce expert testimony on homeless culture, not evidence of prior threats from Craig or someone associated with him.

In evaluating where a defendant's belief in the need to defend is objectively reasonable, "a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge . . . .' [Citation.] It judges reasonableness 'from the point of view of a reasonable person in the position of defendant . . . .' [Citation.] To do this, it must consider all the ""'facts and circumstances . . . in determining whether the defendant acted in a manner in which a *reasonable man* would act in protecting his own life or bodily safety.""' [Citation.] As we stated long ago, '. . . a defendant is entitled to have a jury take into consideration all the elements in the case which might be expected to operate on his mind . . . .'" (*People v. Humphrey*, *supra*, 13 Cal.4th at pp. 1082-1083.)

13

Here, the jury was provided with the facts and circumstances that may have operated on appellant's mind through Pearce's and his own testimony. The jury was aware members of the encampment were close-knit and considered themselves to be like a family, strangers at encampments were not welcomed for safety reasons and in the past had been asked to leave, there was an "unwritten code of conduct" among experienced homeless that included respecting personal space because others would be "defensive" if their space was breached, and homeless people carried weapons. Moreover, through Dr. Kaser-Boyd's testimony and defendant's own testimony, the jury was aware of appellant's personal history and circumstances and how these factors affected his response to Craig.

We find no error in the trial court's exclusion of Dr. Stefandidis's testimony.

## III.    Exclusion of Johnson's Statement to Police About Victim's Claim of Gang Membership

Appellant argues the trial court misunderstood the law on the spontaneous statement exception to the hearsay rule and erroneously required evidence of Johnson's observable stress and excitement before it would admit his statement to police officers that Craig claimed to be a gang member.[11] We find no error.

Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." To be admissible under the spontaneous statement exception, "'(1) there must be some occurrence startling enough to produce . . . nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be

---

[11] Appellant concedes that the evidence was not "so overwhelmingly in favor of the conclusion that Johnson was still under the excitement and stress of the stabbing that no court could have come to any other conclusion" and instead focuses on whether the trial court misapprehended the law.

14

supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.'" (*People v. Poggi* (1988) 45 Cal.3d 306, 318.) "A number of factors may inform the court's inquiry as to whether the statement in question was made while the declarant was still under the stress and excitement of the startling event and before there was 'time to contrive and misrepresent.' [Citation.] Such factors include the passage of time between the startling event and the statement, whether the declarant blurted out the statement or made it in response to questioning, the declarant's emotional state and physical condition at the time of making the statement, and whether the content of the statement suggested an opportunity for reflection and fabrication. [Citations.] . . . [Citation.] . . . [N]o one factor or combination of factors is dispositive." "Whether an out-of-court statement meets the statutory requirements for admission as a spontaneous statement is generally a question of fact for the trial court, the determination of which involves an exercise of the court's discretion." (*People v. Merriman* (2014) 60 Cal.4th 1, 64-65.)

Here, defense counsel sought to call police officers to testify that soon after they took Johnson into custody, he told them that Craig claimed to be a gang member.[12] The trial court stated the mere nearness of Johnson's statements to the time of the event was not enough to qualify it as a spontaneous statement and suggested defense counsel establish Johnson was under the stress and excitement of the startling event by asking about his demeanor, including eliciting evidence of heavy breathing, talking quickly, or pacing.

Officer Ibarra testified that when detained, Johnson was cooperative and spoke in a regular voice, neither loud nor soft. Officer Ibarra could not tell if Johnson had stress or anxiety in his voice and did not recall if Johnson was sweating. Johnson was not

---

[12] The prosecutor initially objected to the statement as irrelevant since there was no evidence appellant had heard Craig's claim of gang affiliation. After appellant testified he heard Craig's claim of gang affiliation, the prosecutor objected on the ground that Johnson's statement was not spontaneous.

15

pacing back and forth before being taken into custody. The trial court found insufficient foundation to admit Johnson's statement.

Appellant contends the trial court misapprehended the law because it stated, "the mere passage of time or the nearness in time is not enough." The amount of time between the startling incident and the statement is one of a number of factors the trial court was required to analyze in exercising its discretion and no one factor is dispositive. (*Merriman*, *supra*, 60 Cal.4th at pp. 64-65.) Thus, the trial court's statement is a correct statement of the law and does not suggest that the court misunderstood the law or the factors to be considered.

Appellant also contends the trial court improperly required observable evidence of Johnson's nervousness and excitement. A declarant's emotional state and physical condition at the time of making the statement is one of the factors a court may properly consider. (*Merriman*, *supra*, 60 Cal.4th at pp. 64-65.) The trial court's suggestion to defense counsel to ask about Johnson's demeanor in order to elicit evidence about his emotional state and physical condition does not show that the trial court incorrectly believed outward indications of stress were a necessary or dispositive factor.

We find no error in the trial court's conclusion that the spontaneous statement exception did not apply.

## IV. Admission of Defendant's Prior Robbery Conviction as Impeachment Evidence

In 2001, appellant was convicted of robbery in New York. He contends the trial court abused its discretion when it admitted evidence of this conviction at trial for impeachment purposes. We disagree.

In determining the credibility of a witness, the jury may consider any matter that has a tendency in reason to prove or disprove the truthfulness of his testimony at the hearing. (Evid. Code, § 780.) "Past criminal conduct involving moral turpitude that has some logical bearing on the veracity of a witness in a criminal proceeding is admissible

16

to impeach, subject to the court's discretion under Evidence Code section 352."[13] (*People v. Harris* (2005) 37 Cal.4th 310, 337.) In "exercising their discretion, trial courts should continue to be guided—but not bound—by the factors set forth in *People v. Beagle* (1972) 6 Cal.3d 441, and its progeny." (*People v. Clair* (1992) 2 Cal.4th 629, 654.) The *Beagle* factors are "(1) whether the prior conviction reflects on honesty and integrity; (2) whether it is near or remote in time; (3) whether it was suffered for the same or substantially similar conduct for which the witness-accused is on trial; and, (4) finally, what effect admission would have on the defendant's decision to testify." (*People v. Castro* (1985) 38 Cal.3d 301, 307.) "These factors need not be rigidly followed." (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 925.)

In general, the "'trial courts have broad discretion to admit or exclude prior convictions for impeachment purposes . . . . The discretion is as broad as necessary to deal with the great variety of factual situations in which the issue arises, and in most instances the appellate courts will uphold its exercise whether the conviction is admitted or excluded.'" (*People v. Hinton* (2006) 37 Cal.4th 839, 887.)

Here, the trial court cited to *Beagle*'s "four sets of factors for the court to consider" and concluded that appellant's 2001 conviction reflected on his honesty or integrity, was "somewhat remote" in time but was "not really that old" given appellant was incarcerated part of the time, was not similar to the charged murder, and would have an unclear impact on appellant's decision to testify. After argument, the trial court ruled under Evidence Code section 352 that evidence of the robbery conviction was admissible to impeach appellant if he decided to testify. The trial court offered to sanitize the conviction or simply to describe it to the jury as a robbery, and defense counsel elected to have it described as a robbery. Appellant decided to testify. During his direct

---

[13] Under Evidence Code section 352, the trial court "in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

examination, appellant testified he was convicted of robbery in New York when he was 19 years old and during his incarceration for that crime, two men raped him.

Appellant has failed to show the trial court's decision was an abuse of discretion. As appellant acknowledges, the crime of robbery is a crime of moral turpitude, which makes it eligible for use as impeachment evidence. (*People v. Clark* (2011) 52 Cal.4th 856, 931.) Nonetheless, appellant argues robbery is not a crime that "significantly involve[s] honesty or integrity." (*People v. Rist* (1976) 16 Cal.3d 211, 221.) However, any felony conviction involving moral turpitude, even if the immoral trait is other than dishonesty, may be admissible because "'a witness' moral depravity of any kind has "some tendency in reason" [citation] to shake one's confidence in his honesty. . . .'" (*People v. Wheeler* (1992) 4 Cal.4th 284, 295; *People v. Green* (1995) 34 Cal.App.4th 165, 182.)

Remoteness makes a crime less probative of credibility "if [the crime] occurred long before [the current trial] and has been followed by a legally blameless life." (*Beagle*, *supra*, at p. 453.) Here, as the trial court noted, appellant was convicted of robbery in New York in October 2001, sentenced to 42 months in prison, and was presumably released sometime between 2003 and 2005. Thus, appellant had a gap of eight to 10 years between his robbery conviction and Craig's murder. Appellant argues the remoteness of this conviction weighed in favor of its exclusion, but as he acknowledges, the length of time between a prior conviction and the current trial does not render a conviction inadmissible per se. (*People v. Burns* (1987) 189 Cal.App.3d 734, 738; see *Mendoza*, *supra*, 78 Cal.App.4th at pp. 925-926 [convictions remote in time are not automatically inadmissible].) The trial court properly considered and weighed this factor, stating that it was "somewhat remote" in time but was "not really that old," given that appellant was incarcerated for part of the time.

There is no contention that the robbery conviction was substantially similar to the murder charge in this case. (See *Beagle*, *supra*, 6 Cal.3d at p. 453.)

And lastly, the admission of the prior conviction did not prevent appellant from testifying. Although appellant argues he faced a "strong danger of prejudice if he did not

testify" since his testimony was necessary to lay the foundation for introduction of the expert testimony, as the trial court noted, appellant's testimony "is quite critical to the case, so it seems to me that the probative value of anything that bears on his credibility is substantial."

The trial court did not abuse its discretion in permitting impeachment with the robbery conviction.

## V.     Jury Instruction on Flight

Over defense counsel's objection, the trial court instructed the jury on flight, using CALCRIM No. 372.  Appellant contends this instruction was not supported by substantial evidence.  We disagree.

CALCRIM No. 372 provides:  "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt.  If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct.  [¶]  However, evidence that the defendant fled cannot prove guilt by itself."

"'A flight instruction is proper whenever evidence of the circumstances of [a] defendant's departure from the crime scene . . . logically permits an inference that his movement was motivated by guilty knowledge.'" (*People v. Abilez* (2007) 41 Cal.4th 472, 522.)  "To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence." (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.)  The record reveals sufficient evidence of flight to warrant giving the instruction.  Appellant left the encampment in downtown Los Angeles, taking the knife he used to stab Craig, and went to Echo Park, where he threw the knife in a lake.

Appellant emphasizes that he tried to approach police officers detaining Johnson to speak but was told to step back, before he "casually" walked away.  While this evidence may support an inference that appellant did not leave because of his guilt, it was up to the jury to decide what inferences to draw once substantial evidence supported giving the flight instruction.

19

## VI. Cumulative Error

Appellant contends that the cumulative effect of the above errors was prejudicial. There was, however, no error to cumulate.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

JOHNSON, J.